**COLVILLE CONFEDERATED TRIBES, Plaintiff,**

v.

**Boyd WALTON, Jr., et ux., et al., Defendants.**

**State of Washington, Defendant-Intervenor.**

**UNITED STATES of America, Plaintiff,**

v.

**William Boyd WALTON et ux., et al., and the State of Washington, Defendants.**

Nos. C–3421, C–3831.

United States District Court, E. D. Washington.

Oct. 25, 1978.

William H. Veeder, Alexandria, Va., Stephen L. Palmberg, Colville Confederated Tribes, Nespelem, Wash., for Colville Confederated Tribes.

Slade Gorton, Atty. Gen., Charles B. Roe, Jr., Sr. Asst. Atty. Gen., Laura E. Eckert and Robert E. Mack, Asst. Attys. Gen., Olympia, Wash., for State of Wash.

James J. Gillespie, U. S. Atty., and Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for the U. S.

Nansen & Price, Omak, Wash., for Waltons.

## MEMORANDUM OPINION

NEILL, Chief Judge.

In these consolidated cases plaintiffs seek declaratory and injunctive relief relating to the rights to waters of a very small waterway located entirely within the exterior boundaries of the Colville Indian Reservation in north central Washington. As the result of this extended litigation this formerly nameless waterway has acquired the appellation "No Name Creek". Because the surface water of No Name Creek has a hydraulic relationship with the underlying aquifer, these actions include rights to both surface and ground waters of the creek basin.

The Colville Confederated Tribes (Tribe) brought suit in 1970 to enjoin defendants Walton, who are not Indians, from using No Name Creek waters, claiming that the tribal reserved water rights were superior to Waltons' rights and that there was insufficient water to satisfy both the Tribe's and Waltons' needs. The State of Washington intervened asserting its authority to grant water permits on reservation lands. The United States brought suit against Waltons and the State of Washington, alleging identical issues of reserved water rights. The actions have been consolidated.

This Court has jurisdiction in Cause No. 3421 under 28 U.S.C. § 1362 and jurisdiction in Cause No. 3831 under 28 U.S.C. § 1345. In these actions the Court must determine first, the relative water rights of the Tribe and defendants Walton, and second, the relative authority of the Tribe, the United States, and the State of Washington to regulate, allocate and control the subject water.

## BACKGROUND [1]

No Name Creek and its basin lie entirely within the Colville Indian Reservation. The Reservation was established by executive order on July 2, 1872, as a home for various bands of Indians now known as the Colville Confederated Tribes. It is located in a semi-arid and mountainous region in north central Washington. No Name Creek, which originates on Allotment No. 892 north of the Walton property, is spring fed, flows southerly approximately three miles and empties into Omak Lake. The lake is composed of saline water, unsuitable for irrigation purposes.

Water from the No Name Creek basin presently serves seven parcels of land, all at one time allotted to individual Indians. The only lands within the basin presently held by non-Indians are the three allotments owned in fee by Waltons, each of which borders No Name Creek. The other four allotments in the basin are either held in trust by the United States for the heirs of the allottees and leased to the Tribe or are held in trust directly for the benefit of the Tribe. Historically, the two allotments to the north of Waltons were irrigated with surface waters from Omak Creek located on the northernmost allotment, while the two allotments south of Waltons were irrigated with waters diverted from No Name Creek.

Defendants Walton claim water rights on two theories. First, they claim rights as successors to Indian allottees. Second, they claim appropriative rights perfected under state law. Using water diverted from No Name Creek and water pumped from an irrigation well drilled in the 1970's, Waltons are presently irrigating 105 acres.

Waltons' first claim is based on a tracing of the title to their land through mesne conveyances back to the original Indian allottees. The allotments now owned by the Waltons passed from Indian ownership in 1942. The former Indian allottees had not irrigated these lands. In 1946, this land was again sold, and although the purchaser was Indian, he was not a member of the Colville Tribes. When Walton bought the property in 1948, approximately 32 acres were under irrigation. Based upon the right to use of water by the Indian allottees, defendants Walton claim to have succeeded to a right to irrigate all of their irrigable acreage or, alternatively, to a right to irrigate a minimum of the 32 acres which were under irrigation at the time of purchase.

Waltons' claim to an appropriative water right is based on a state certificate. Immediately after purchasing the land in 1948, Walton applied to the State for a permit to divert 3 cu. ft. per second from the creek to irrigate 75 acres. Pursuant to this application the state in 1950 issued Walton a certificate of water right to irrigate 65 acres by diverting 1 cu. ft. per second. This certificate was granted "subject to existing rights".

The Tribe bases its claim to water on the doctrine of reserved water rights. It asserts the right to irrigate the 228 irrigable acres contained in the four Indian-held allotments within the No Name Creek Basin. In addition, the Tribe claims the right to sufficient water to support spawning grounds in the creek for Lahontan cutthroat trout.

Presently the Tribe is irrigating 157 of the 228 Indian-held irrigable acres in the basin. Some of these acres historically were irrigated from the surface water of Omak Creek and No Name Creek. In 1975 the Tribe initiated an extensive irrigation project in the basin. Wells were drilled on the northern allotments to provide irrigation waters for the northern acres, and some well water was pumped into No Name Creek to serve the needs of the two southern allotments. The crops grown on these allotments are used to support the Paschal Sherman Indian School.

In 1968 the Tribe with the aid of the United States Department of Interior introduced Lahontan cutthroat trout into Omak

---

1. See appendix for agreed facts and map.

Lake. At that time this species was classified as endangered. Although these trout thrive in salt water, they require fresh water spawning grounds. No Name Creek is the only fresh water source into the lake. The Tribe rerouted the course of lower No Name Creek to improve access from the lake to the fresh water spawning grounds. These trout are also artificially propagated in a federal hatchery in Winthrop, Washington and made available to the Tribe. The Tribe, however, claims a reserved right for water to maintain the spawning grounds in the creek.

The Tribe and the United States, as trustee, seek to enjoin Waltons' interference with tribal use of No Name Creek Basin waters. They also seek a declaration that the State of Washington has no jurisdiction to issue water permits within the boundaries of the Reservation and that the permits heretofore issued to Waltons are null and void.

This litigation requires a determination of four complex issues of Indian water rights: 1) what effect the General Allotment Act has on Indians' reserved water rights; 2) whether a non-Indian grantee of an Indian allotment may succeed to his Indian grantor's reserved rights; 3) the amount of water available to each party in this action; and 4) whether a state may issue water permits to non-Indian landowners within the boundaries of an Indian reservation.

EFFECT OF THE GENERAL ALLOTMENT ACT ON RESERVED WATER RIGHTS

Waltons claim a water right based on the prior status of their property as Indian allotments. They assert that the General Allotment Act, 25 U.S.C. § 331 *et seq.*, passed to the individual Indian allottees a portion of the reservation's reserved water, which became appurtenant to the allotted land and was conveyed when the land was sold. An analysis of the effect of the General Allotment Act on the allottee's water rights requires an understanding of the origin of the reserved water rights doctrine, the scope of that doctrine, and the purpose of the General Allotment Act.

In *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908), the Supreme Court established the doctrine of implied reservation of water. The Court determined that when the United States set aside lands as Indian reservations, it intended to provide a suitable homeland for the Indians so they could change from their nomadic ways to "become a pastoral and civilized people." *Id.* at 576, 28 S.Ct. at 211. As recently noted by the Supreme Court, "It can be said without overstatement that when the Indians were put on these reservations they were not considered to be located in the most desirable area of the Nation." *Arizona v. California*, 373 U.S. 546, 598, 83 S.Ct. 1468, 1497, 10 L.Ed.2d 542 (1963). The creators of the western reservations were aware of the arid nature of the region, and of the fact that water is "essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Id.* at 599, 83 S.Ct. at 1497. When Congress placed the Indians on reservations, it took from them "the means of continuing their old habits" and therefore must have intended to give them "the power to change to new ones." *Winters, supra*, 207 U.S. at 577, 28 S.Ct. at 212. Because the reservation lands were arid and were "practically valueless" without irrigation, the *Winters* Court held that the Indians were entitled to an adequate supply of water.

As defined in *Cappaert v. United States*, 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976), the *Winters* reserved water rights doctrine provides that upon the establishment of any federal reservation the United States "reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." The *Winters* reserved water right "vests on the date of the reservation and is superior to the rights of fu-

ture appropriators." *Id.* *Winters* rights apply to reservations created by executive order, as well as to those created by treaty or act of Congress. *Arizona v. California, supra,* 373 U.S. at 598, 83 S.Ct. 1486. They extend to ground water as well as surface water. *Cappaert, supra,* 426 U.S. at 142–143, 96 S.Ct. 2062. Where the purpose of establishing the reservation was to turn the Indians into an agrarian society, as is the case with the Colville Reservation, the amount of water impliedly reserved is that which would satisfy future as well as present needs, measured in terms of enough water to irrigate "all the practicably irrigable acreage" on the reservation. *Arizona v. California, supra,* 373 U.S. at 600, 83 S.Ct. 1468. The reserved rights are open-ended and do not depend on actual use to be maintained. Water is therefore available whenever needed to fulfill the purposes of the reservation. The reserved amount of water must be made available despite inequities to the non-reserved users. *Cappaert, supra,* 426 U.S. at 138, 96 S.Ct. 2062. Therefore, reserved water rights are not lost by laches, estoppel or adverse possession. *See United States v. Ahtanum Irr. Dist.,* 236 F.2d 321 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957), *rev'd.,* 330 F.2d 897 (9th Cir.), *rehearing denied,* 338 F.2d 307 (9th Cir. 1964), *cert. denied,* 381 U.S. 924, 85 S.Ct. 1558, 14 L.Ed.2d 683 (1965).

The General Allotment Act of 1887, (25 U.S.C. § 331 *et seq.*) (the Dawes Act), was designed to help reservation Indians assimilate into the dominate culture by authorizing the division of communally-held tribal lands into specific tracts for each of the tribe's members. Unallotted lands within the reservations would then be opened to non-Indians with the apparent intent to promote interaction between the races and to encourage Indians to adopt white ways. *Mattz v. Arnett,* 412 U.S. 481, 496, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). It was hoped that the Indians would learn to farm their property from such association with white neighbors. Since the Indians were con-

sidered unsophisticated and the whites were known to desire increased land holdings, the allotted lands were to be held in trust by the United States for the allottees for twenty-five years, (25 U.S.C. § 348) after which a fee patent could issue to the Indians. *Id.* Section 7 of the Dawes Act (25 U.S.C. § 381) provides that where water is necessary for irrigation, the Secretary of Interior is authorized to see that the available water is divided in a just and equal manner among the Indians residing on the reservation.

This Court concludes, based upon a reading of the relevant cases, that the Dawes Act did not deprive the allottee of his share of the reservation's reserved water. Reserved rights belong to each individual Indian. *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). Under the doctrine, tribal members own the reserved water from the time of the creation of the reservation; at the time a tribal member acquires an allotment, his reserved rights become appurtenant to his land. *United States v. Preston,* 352 F.2d 352, 358 (9th Cir. 1965). Thus, as stated in *United States v. Powers,* 305 U.S. 527, 532, 59 S.Ct. 344, 83 L.Ed. 330 (1939), when allotments were made, a portion of the waters within the reservation which had been reserved for the equal benefit of the tribal members passed to the allottees.

## ALIENABILITY OF RESERVED WATER RIGHTS

As the discussion above indicates, the Indian allottee owns, as appurtenant to his allotment, his proportionate share of the reservation's reserved water. *Preston, supra,* at 358. He retains these rights after he is issued the fee patent to his allotment. *Powers, supra,* at 532, 59 S.Ct. 344. The settled issued of what the Indian allottee owns is distinct, however, from the unresolved issue of what rights the allottee may alienate to a non-Indian.

The parties to this litigation have taken three different stances on this latter issue.

Waltons and the State of Washington assert that since *Winters* rights are appurtenant to the Indian allotment, the rights are transferred at the time of the conveyance of the allotment to a non-Indian. The Tribe, on the other hand, contends that *Winters* rights are tribal rights and that Congress, in the Dawes Act, did not intend to divest the Tribe of those rights. The Tribe therefore argues that an allottee may only hold his proportionate share of the tribal rights while holding the land and may not alienate these water rights with his land when he sells the allotment to a non-Indian. The United States takes a middle ground. It asserts that the allottee may sell to a non-Indian a right to that portion of the water which was being put to beneficial use at the time the allotment left trust status and that this transferable water right would have a priority date of the establishment of the reservation.

Although several opinions arguably indicate that reserved water rights appurtenant to an allotment may be conveyed to a non-Indian grantee, this Court finds no clear and binding precedent on the issue.

The Ninth Circuit has held that reserved water rights remain appurtenant to the allotted land when it remains in Indian ownership but is leased to a non-Indian. *Skeem v. United States*, 273 F. 93 (9th Cir. 1921). The Court was not faced in that action, however, with the issue of what water rights may be sold.

In another early decision, the Idaho Federal District Court held that the non-Indian purchaser of an Indian allotment located outside the reservation boundary acquired a water right to irrigate the acreage that was under irrigation at the time title passed from the Indians, and such increased acreage as he might with reasonable diligence place under irrigation. *United States v. Hibner*, 27 F.2d 909 (D. Idaho 1928). The priority date was found to be the same as that owned by the Indian allottees—the date of the establishment of the reservation. *Id.* at 912. Unlike the Indian, how-

ever, whose rights were open-ended, and independent of actual use of the water, the purchaser took with a *Winters* priority date only that amount of water used by the Indian predecessors plus that which he could put to use within a reasonable time. The Court's conclusion was not appealed.

Almost two decades after *Hibner*, the Supreme Court faced the same Indian water rights issues, but avoided resolving those issues by disposing of the case on a procedural ground. *In United States v. Powers*, 305 U.S. 527, 529, 59 S.Ct. 344 (1939), the United States sought to enjoin the defendants, non-Indian successors to allottees, from diverting water from above an irrigation project on the reservation. The Government claimed that owners of lands which were not part of the project were not entitled to divert water to the detriment of the project. Although this claim was dismissed by the trial court, it determined that allottees passed to their grantees whatever water rights they possessed. The court then proceeded to quantify those rights. The Ninth Circuit affirmed the dismissal of the United States' claim, but held that the trial court lacked jurisdiction to quantify defendants' rights because parties indispensible to the action were not before the court. 94 F.2d 783, 786 (9th Cir. 1938). Included among the indispensible parties not before the court were Indian allottees living above the project. The Supreme Court affirmed. Neither the Ninth Circuit nor the Supreme Court determined what rights, if any, the parties had to the water in question. *Id.* at 786; 305 U.S. at 533, 59 S.Ct. 344. In response to the Government argument that allottees have no rights to the reserved water, the Supreme Court stated in dictum "that when allotments of land were duly made for exclusive use and thereafter conveyed in fee, the right to use some portion of tribal waters essential for cultivation passed to the owners." 305 U.S. at 532, 59 S.Ct. at 346. The nature of this right, however, was left undefined.

This Court declines to rely on any of these cases in resolving the issue of aliena-

bility. The Court finds more instructive an analysis of first, the rationale for development of the reserved rights doctrine, and second, recent Supreme Court opinions concerning the concept of reserved rights generally.

■ An analysis of the rationale for the reserved rights doctrine convinces this Court that the implied reservation of waters on Indian reservations should be limited to Indian ownership. *Winters* doctrine rights were reserved to members of the Indian tribe living on the reservation. *Winters, supra,* 207 U.S. at 576, 28 S.Ct. 207; *Arizona v. California,* 373 U.S. at 600, 83 S.Ct. 1468. Water was impliedly reserved to ensure that the lands intended to be permanent homelands for the Indians would have the necessary water to fulfill that purpose. *Id.* The Indians of the Northwest were not agrarian at the time they were forced onto reservations. The transition from the traditional nomadic life to an agrarian existence required the development of agricultural skills. Implied reserved water rights are open-ended so that as the Indians develop the necessary skills they are able to appropriate the water required to make the land productive. *See Winters, supra.* When title to Indian lands passes into non-Indian hands, the purposes for which the reserved water rights are implied no longer exist. It therefore seems logical to conclude that reserved water rights on Indian reservations are limited to Indians.

■ The conclusion that water rights reserved for Indian reservations must be limited to tribal members is supported by recent Supreme Court opinions which have articulated a more restricted view of the concept of reserved rights in general. In *Cappaert v. United States, supra,* the Court held that when the Government establishes a federal reservation it reserves "only that amount of water necessary to fulfill the purpose of the reservation, no more." 426 U.S. 128, 141, 96 S.Ct. at 2071 (1976). This

limitation was reemphasized in *United States v. New Mexico,* —— U.S. ——, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). The purpose of the reservation is to be determined from the intent of the creators at the time of the withdrawal from the public domain. *Id.* The reservation of water may be implied only where such water is essential to preserve the purpose for which the reservation was created. No reservation of water may be implied for any use which is not based on one of the purposes for which that land was reserved. *Id.* at —— –——, 98 S.Ct. 3012. Applying these recent restricted concepts of reserved rights, it is clear that when the reserved purposes are terminated, as when a national park is returned to the public domain or when Indian property is sold to non-Indians, the reserved rights can no longer be judicially implied.

■ This Court therefore concludes that *Winters* reserved rights do not per se apply to allotments owned by non-Indians. This conclusion, however, does not foreclose possible availability of water to the non-Indian grantee.

The General Allotment Act in permitting sale of allotments to non-Indians necessarily implies that some water rights may be sold with the land; otherwise the right to sell the land would be relatively worthless. The Act was designed to put Indians on an equal footing with the white man by allowing individual Indians to own fee title to land. *See* Comments of Carl Schurz, Secretary of Interior, Report of Nov. 1, 1880, in 1 House Exec. 5-6, quoted in F. PRUCHA, AMERICANIZING THE AMERICAN INDIANS, 83–86 (1973). In providing fee ownership, Congress certainly intended that the Indian could sell his land like any other owner. Providing for alienability of implied reserved water rights is not necessary to accomplish this purpose. The General Allotment Act purpose requires only that the allottee be permitted to convey a water right with his fee to the same extent as a non-Indian homesteader.

■ Non-Indians homesteaded much of the original Colville Reservation. Under

the Desert Land Act, 19 Stat. 377 (1877), which severed water rights from lands in the public domain, see *California-Oregon Power Co. v. Beaver Portland Cement Co.,* 295 U.S. 142, 160-63, 55 S.Ct. 725, 79 L.Ed. 1356 (1935), homesteaders of public lands were required to perfect water rights under state law and could convey only those water rights which they had so perfected. By an 1892 Act, Congress withdrew from trust status the northern half of the Colville Reservation, restoring that portion to the public domain and opening it to settlement. The Desert Land Act with its effect on water rights definitely applies to these northern lands. The southern half of the reservation was preserved, *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), but the 1906 Congress, 34 Stat. 80, opened surplus unallotted lands within the "diminished" Colville Reservation to settlement under the homestead laws pursuant to the General Allotment Act. While it is not clear whether the surplus lands within the reservation became part of the public domain when they were opened for settlement, *Seymour, supra,* 368 U.S. at 355-56, 82 S.Ct. 424, and thus whether the Desert Land Act applied to those lands, strong policy arguments militate against implying reserved water rights for homesteaded surplus lands. To allow homesteaders to share in the reservation's reserved water rights would greatly diminish a valuable Indian asset. The General Allotment Act and the 1906 Act cannot be interpreted as giving non-Indian settlers a share of the Indians' reserved water rights, for such a Congressional intent is not clear, and the general rule of interpreting acts affecting Indians requires that "[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith." *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973), quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930). *See also DeCoteau v. District County Court,* 420 U.S. 425, 444, 95 S.Ct. 1082, 43 L.Ed.2d

300 (1975). Thus, it would appear that settlers of surplus lands within the reservation may claim and transfer only rights to unreserved water.

In keeping with the purpose of the General Allotment Act, the allottee, like the non-Indian homesteader, must be permitted to convey with his land the water right which he was using at the time of the conveyance, with a priority date of the first appropriation of those waters. The priority date must be the date of actual appropriation rather than that of the founding of the reservation, for no part of the Indian allottee's implied water rights may be conveyed to a non-Indian. The value of allotments with these "in use" water rights, without *Winters* rights, is therefore comparable to homesteaded lands.

■ However, the *Winters* rights which were formerly associated with the allotment when held by a member of the tribe do not escheat to the tribe when the allotment is sold to a non-Indian. Since the purpose of the implied reservation is defeated by the sale to a non-Indian, the right is lost completely, and the number of irrigable acres in non-Indian hands may not be used to calculate the quantity of waters reserved for the lands remaining in Indian hands. By thus reducing the quantity of reserved waters within the reservation, more water is available for appropriation by non-Indian landowners.

■ Accordingly, the Court finds that Waltons succeeded to the water right to irrigate the 32 acres under irrigation at the time of acquisition, with a priority date of actual appropriation of water for that use.

## QUANTIFICATION OF WATER RIGHTS

Water within the No Name Creek Basin is limited. Estimates as to available water in the Basin range from 550 acre feet per year as testified by the Tribe's expert witness to 1300 acre feet per year as testified by defendants' expert. A witness employed by the United States Geological Survey es-

timated that 1100 acre feet per year should be available for consumptive uses.

The four allotments remaining in Tribal ownership (or trust status) in the Basin contain a total of 228 irrigable acres, 157 of which are presently being irrigated. The northernmost of the four Indian-held allotments (allotment 526) is within No Name Creek water basin, but has no surface contact with the creek. In fact, another waterway, Omak Creek, traverses this allotment. There is evidence that allotment 526 was formerly irrigated with the plentiful surface waters of Omak Creek. Therefore, for purposes of quantification of water rights within the No Name Creek Drainage Basin, the acreage of the northernmost allotment will be excluded. The remaining three Indian-held allotments in the Basin contain 166.6 irrigable acres, 107.2 of which are presently under irrigation.

Estimates of the water duty, being that amount of water required per acre to grow crops, range from 4.8 acre feet to 3.6 acre feet. A witness from the United States Soil Conservation Service testified that most farmers in the Okanogan Valley near the No Name Creek Basin require 3.1 to 3.6 acre feet. Using 4.0 acre feet as the duty, the Tribe should have a total of 666.4 acre feet of water from the Basin per year reserved for their irrigable acreage within the Basin; and the Tribe would need 428.8 acre feet per year to irrigate the 107.2 acres presently under irrigation.

In addition to water for irrigation, the Tribe asks this Court to imply a reservation of water to support the Lahontan cutthroat trout spawning grounds. While the Tribe acknowledges that this species is non-indigenous, it claims that fish continue to be a traditional source of food for the members of the Tribe. Much of the natural source of fish for the reservation, the salmon and cutthroat trout runs on the Columbia River, was eliminated by construction of power and reclamation dams by the government. The Tribe asserts that fish was a natural food source for the Indians and that by

establishing the reservation on the shores of the Columbia, President Grant intended to assure that fish would remain an available food source. Since the government-built dams have depleted that source of food, the Tribe claims it was imperative to introduce non-indigenous fish to replace the lost sources and to preserve one of the purposes of the reservation.

■ Under the *Winters* doctrine, this Court must look to the purposes for which the reservation was created to determine the uses for which the reservation of water may be implied, and thus to determine whether the Tribe is entitled to water for the trout. *Cappaert, supra.* The Colville Reservation was set aside as a homeland for the Indians; therefore the reservation of water sufficient to raise crops and provide food must be implied. Fish was a traditional food source of Washington Indians. *Winans, supra.* Since the natural supplies of fish have been reduced by events beyond the Tribe's control, it is logical that they should seek other means to insure the availability of that food source. Under the *Winters* doctrine, a reservation of water may be implied only to the extent necessary to fulfill the purpose of the reservation. *Cappaert, supra.* Since the Lahontan trout are presently being propagated successfully in a federal hatchery in Winthrop and made available to the Tribe, the maintenance of spawning grounds in No Name Creek is not essential to insure the supply of that fish to the reservation Indians. The purpose for which the reservation was created would not be defeated if this Court does not imply a reservation for the spawning grounds so long as the hatchery spawn is available to the Tribe. Therefore, a reservation of water for such use will not be implied at this time. *New Mexico, supra.*

■ This Court finds that 1000 acre feet per year of water are available in No Name Creek Basin in an average year and that a total of 666.4 acre feet of water are reserved to the members of the Tribe for potential irrigation of the Indian-held allot-

ments. Defendants Walton may divert water in excess of the reserved waters being used by the Tribe in any given year, with a priority date of actual appropriation. Since only 428.8 acre feet per year of the reserved amount is presently being used, 571.2 acre feet per year are available for appropriation. At such time as the Tribe requires its full reserved amount, less water will, of course, be available for appropriation. Should the amount of available water be less in any year than is required to fulfill the needs of the parties, the reserved rights of the Tribe, having a priority date as of the creation of the reservation, must be first fulfilled before Waltons' appropriative rights may be exercised.

## EFFECT OF STATE WATER PERMITS WITHIN THE RESERVATION

The Tribe and the United States contend that the State of Washington has no authority to issue permits for appropriation of water within the reservation for use on lands within the reservation, and that permits issued to Waltons are null and void. The Tribe and the United States differ in opinion, however, concerning who ultimately holds such authority. The United States claims exclusive federal jurisdiction to regulate reservation waters. The Tribe claims that the power vested in the Secretary of Interior under 25 U.S.C. § 381 is not exclusive and that the Tribe itself has inherent power to regulate its own waters.

 Although Congress has plenary power over Indian reservations, *see McClanahan, supra,* 411 U.S. at 172, n. 7, 93 S.Ct. at 1262, not all state jurisdiction over reservation lands has been barred. *See, e. g., New York ex rel. Ray v. Martin,* 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946); *DeCoteau, supra,* 420 U.S. at 427, n. 2, 95 S.Ct. 1082. Under the test set out in *Williams v. Lee,* 358 U.S. 217, 220, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), a state may exercise jurisdiction within the exterior boundaries of an Indian reservation where Congressional legislation has not preempted this power and where to

do so would not interfere with the tribe's right to self-government. Land within the exterior boundaries of the reservation held in fee by a non-Indian, such as the Walton land, is still considered part of the reservation. *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). As to such non-Indian lands within the reservation

> [b]oth the tribe and the State could fairly claim an interest in asserting their respective jurisdictions. The *Williams* test was designed to resolve this conflict by providing that the State could protect its interest up to the point where tribal self-government would be affected.

*McClanahan, supra,* 411 U.S. at 179, 93 S.Ct. at 1266.

In applying the *Williams v. Lee* test the Court finds no definitive action of Congress preempting state jurisdiction, although legislation set out some limitations to its exercise. The General Allotment Act provided that the Secretary of Interior could act to assure just and equal distribution of water among the Indians residing on the reservations where water was necessary for irrigation. 25 U.S.C. § 381. The Act did not speak to division of water among non-Indian successors to allottees' interests. It did provide, however, that upon issuance of a fee patent, the allotment was to become subject to all civil and criminal laws of the state in which it was located. 25 U.S.C. § 349. Another Congressional Act, Public Law 83-280, requires certain states, and permits other states, to assume civil and criminal jurisdiction over Indian reservations. This Act, however, does not govern jurisdiction over regulation of excess reservation waters. The Act states:

> Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or

shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute, or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein.

25 U.S.C. § 1322(b)

■ A state attempt to interfere with the distribution of the Indians' reserved waters would conflict with the above mentioned federal statutes. However, where the State issues a water permit for irrigation of fee land owned by a non-Indian, and the permit is subject to existing rights, including all Indian reserved rights, the State action is not contrary to any jurisdiction preempted by the Federal Government. Such a permit does not alienate, encumber, or tax the Indian property interests as prohibited by 25 U.S.C. § 1322(b).

The other prong of the *Williams v. Lee* test requires this Court to determine whether state action in issuing water permits infringes on the Tribe's right to self-government. The Court concludes that the state action does not so infringe.

In 1948–50 when the State initially issued the Walton permit, the State did not infringe on the Tribe's right to self-government because neither the Tribe nor the Secretary of Interior were exercising any authority over No Name Creek waters. The Tribe at that time was not using any No Name Creek waters to irrigate Indian lands. The Secretary of Interior had not issued regulations to distribute waters in the Valley, and the Tribe had not exercised any inherent authority to regulate water use.

■ More recently the Tribe enacted a Tribal Water Code which the Tribe asserts constitutes a preemption of jurisdiction preventing the state from continuing to exercise regulatory jurisdiction over water on

non-Indian lands. *See Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976). If the Tribe has the power to regulate all water on the reservation, then after the enactment of the Tribal Code, state regulation of waters within the reservation indeed would amount to infringement. *Confederated Tribe of Colville Indian Res. v. State of Wash.*, 412 F.Supp. 651 (E.D.Wash.1976).

■ Indian tribes do possess "a certain degree of independent authority over matters that affect the internal and social relations of tribal life." *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed.2d 706 (1975). Distribution of reservation waters among tribal members qualifies as a matter affecting the internal relations of tribal life, and thus the Tribe must enjoy independent authority to regulate tribal waters, with the Secretary of Interior pursuant to 25 U.S.C. § 381 having concurrent jurisdiction to assure that the water is divided in a just and equal manner among the Indians on the reservation.

■ Whether the Tribe's independent authority extends to regulation of non-reserved water to be used on fee lands owned by non-Indians within the reservation is a more difficult issue. The United States has long recognized and upheld title to water rights perfected under local law. *See Jennison v. Kirk*, 98 U.S. 453, 25 L.Ed. 240 (1879); Act of July 26, 1866, ch. 262, 14 Stat. 251, amended in Act of July 9, 1870, ch. 235, 16 Stat. 217. In 1877 Congress enacted the Desert Land Act, ch. 107, 19 Stat. 377, which permitted water from public lands to be appropriated under state and local law. See *California-Oregon Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 160-63, 55 S.Ct. 725, 79 L.Ed. 1356 (1935). This Act did not relinquish the authority of Congress to reserve unappropriated water for use on lands withdrawn from the public domain. *Arizona v. California*, 373 U.S. at 597-98, 83 S.Ct. 1468. Where water on a federal reservation was

not explicitly reserved and is required for a secondary use, however, the Supreme Court has inferred that "Congress intended . . . that the United States would acquire water in the same manner as any other public or private appropriator." *New Mexico, supra,* —— U.S. at ——, 98 S.Ct. at 3015. Thus, where water is not explicitly or impliedly reserved, it must be appropriated under state water laws even when needed by the Federal sovereign for a federal reserve. *Id.*

If the Federal sovereign does not control unappropriated reservation waters claimed for non-reserved uses, and must claim water for such uses under state law, it follows that Indian tribes must be similarly limited. Because the tribal jurisdiction over water is thus restricted to the regulation of reserved water, state jurisdiction over excess waters will not infringe on the Indians' right to self-government.

▮ This Court accordingly finds that the State's issuance of permits for appropriation of excess waters on the reservation does not invade power preempted by federal legislation and does not infringe on the Tribe's right to self-government. The Court therefore holds that the State of Washington has jurisdiction over the non-reserved waters within the Colville Reservation and that the Colville Tribal Water Code must be limited to regulation of reserved waters.

This Memorandum Opinion shall constitute the Court's findings and conclusions.

An appropriate order will be entered herein in conformance with this opinion. Each party shall, within twenty days, submit and serve a proposed form of order for the Court's consideration.

## APPENDIX

The parties have stipulated to the following facts:

1. Plaintiff tribe is an Indian tribe recognized as such by the Secretary of the Interior.

2. Plaintiff United States is the legal owner of the trust lands within the exterior boundaries of the Colville Indian Reservation for the benefit of the tribe.

3. Defendants Boyd Walton, Jr., and Kenna Jeanne Walton, his wife, and Wilson Walton and Margaret Walton, his wife, are owners in fee of approximately 350 acres of land located within the exterior boundaries of the Colville Indian Reservation. Waltons are mesne grantees of these lands for which the United States had issued fee simple patents. The Walton defendants are not Indians.

4. Defendant State of Washington, through its Department of Ecology, is the state entity having the authority and obligation to administer and enforce the ground and surface water codes (R.C.W. 90.03 and 90.44) of the State of Washington.

5. The lands presently within the boundaries of Colville Indian Reservation were included within the lands ceded to the United States of America by Treaty with Great Britain on June 15, 1846.

6. The original Colville Reservation was created from the public domain by Executive Order of President Grant on July 2, 1872.

7. The State of Washington was admitted to the United States on November 11, 1889, and the Colville Reservation is within the boundaries of said state.

8. The north half of the original Colville Reservation was restored to the public domain by Act of July 1, 1892 (27 Stat. 62).

9. The south half, or "diminished" Colville Reservation, as presently existing, is located in Okanogan and Ferry Counties, Washington.

10. An Act of March 22, 1906 (34 Stat. 80) provided for the sale and disposition of unallotted lands on the diminished reservation. Pursuant to that Act, President Wilson, by Proclamation of May 3, 1916 (39 Stat. 1778), declared the non-mineral unallotted and unreserved lands within the diminished Colville Reservation open to entry

and settlement under the provisions of the homestead laws.

11. By order of September 19, 1934, Secretary of the Interior Ickes withdrew all undisposed-of or surplus land of the diminished Colville Reservation from all forms of entry or disposal under the public land laws of the United States.

12. In an election on April 6, 1935, a majority of the Colville Indians voted to exclude themselves from the operation of the Indian Reorganization Act of 1934. (25 U.S.C. § 461 et seq.). However, the order of the Secretary of September 19, 1934 withdrawing lands from entry was not revoked.

13. By Act of July 24, 1956 (70 Stat. 626), Congress, among other things, restored the undisposed-of lands within the diminished Colville Reservation to the beneficial ownership of the tribe.

14. No Name Creek is a small, non-navigable stream the surface flow of which arises from springs located on and immediately adjacent to the northerly portion of the fee lands owned by defendants Walton and flows in a southerly direction across Waltons' lands, allotted Indian land and tribal lands where it enters Omak Lake.

15. The lands adjacent to the northerly boundary of Waltons' land are designated as Trust Allotment No. 892 (the Peters allotment). The United States is legal owner, as trustee, of said Trust Allotment.

16. After traversing the Waltons' land, No Name Creek enters upon and traverses lands designated as Trust Allotment No. 901 (the Mary Ann or Yatkanolx allotment), where the water course crosses a granite lip. The United States of America is the legal owner, as trustee, of said Trust Allotment.

17. After traversing Trust Allotment No. 901, No Name Creek enters Trust Allotment 903 (the Edwards allotment). The United States of America is the legal owner, as trustee, of said Trust Allotment.

18. In a state of nature, No Name Creek entered Omak Lake within Trust Allotment 903. However, at the present time, the creek flows into Omak Lake by an artificial channel across lands adjacent to Trust Allotment 903, which lands are held by the United States of America as trustee for the Colville Tribes as tribal lands.

19. Omache Lake Resort, operated by the Colville Confederated Tribes, is located on the tribal lands adjacent to Trust Allotment No. 903 and abutting Omak Lake.

20. Waltons' lands have been developed by the Waltons as a homesite and for the operation of a dairy farm. 102 acres thereof are now under irrigation.

21. Waltons use the subject water for domestic, stock water and irrigation purposes. This water is obtained from wells on their land and by diversion from No Name Creek.

22. The 350 acres of land now owned by the Waltons are former trust allotments Nos. 525, 2371, and 894. These former trust allotments were transferred from trust to nontrust status by patents issued by the United States of America as follows:

(a) Allotment No. 525 was allotted to Alexander Smitaken by trust patent. On August 10, 1925, a fee simple patent was issued by the United States to Hattie Justus Wham, removing the property from trust status.

(b) Allotment No. 2371 was issued to George Alexander Smitaken by trust patent dated April 7, 1917. On January 28, 1921, a fee simple patent was issued by the United States to Paul Smitaken, removing the property from trust status.

(c) Allotment No. 894 was allotted to William George by trust patent dated April 7, 1917. On May 5, 1923, a fee simple patent was issued by the United States to Hattie Justus

Wham, removing the property from trust status.

23. Waltons acquired title to these 350 acres by deed dated July 16, 1948.

24. On August 24, 1948, defendant Wilson Walton filed an application with the Washington State Department of Hydraulics, predecessor agency of the State Department of Ecology, for a permit to divert water from No Name Creek for the purpose of irrigation. On November 28, 1949, the Supervisor of Hydraulics issued a permit to Wilson Walton to divert 1.0 cubic feet per second of water from No Name Creek to irrigate 75 acres of land.

25. On August 25, 1950, pursuant to Walton's application the state Supervisor of Hydraulics issued a Certificate of Water Right to defendant Wilson Walton for the diversion of 1.0 cubic feet per second of water from No Name Creek for the irrigation of 65 acres of land.

26. At the time the state Supervisor of Hydraulics issued the foregoing certificate, there was no diversion of water from No Name Creek basin other than by defendant Walton.

27. Subsequent to the commencement of action No. 3421 by the Colville Confederated Tribes, the tribe started a program for the development of underground waters on tribal and trust lands lying north of Waltons' lands.

[See following illustration.]

**MAP OF THE NO NAME CREEK BASIN**