**COLVILLE CONFEDERATED TRIBES,
Plaintiffs/Appellants,**

v.

**Boyd WALTON, Jr., et ux, et al.,
Defendants/Appellees.**

**No. 83–4285.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1984.

Decided Jan. 21, 1985.

Rehearing and Rehearing En Banc
Denied April 22, 1985.

For separate concurring opinion of Sneed, Circuit Judge, see 758 F.2d 1324.

William H. Veeder, Washington, D.C., for plaintiffs/appellants.

Richard B. Price, Omak, Wash., for defendants/appellees.

Before WRIGHT, SNEED, and ALARCON, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

This dispute involves respective rights of the Colville Confederated Tribes (Tribe), Indian allottees and Walton to share in water from the No Name Creek Hydrological System, which was originally reserved for the Tribe under the *Winters* doctrine, when the Colville Reservation was created. *See Winters v. United States*, 207 U.S. 564, 576, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908).

Walton and the Indian allottees seek water for irrigation. The Tribe seeks additional water to establish the Omak Lake Fishery as spawning grounds for the Lahonton Cutthroat Trout as a replacement for fishing grounds lost to development on the Columbia River. The Tribe currently pumps water from the aquifer into No Name Creek during spawning season.

The factual and legal background to this 14-year-old dispute is thoroughly reviewed in *Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320 (E.D.Wash.1978) (*Walton I*) and *Colville Confederated Tribes v. Walton*, 647 F.2d 42 (9th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981) (*Walton II*). We note only the most salient facts.

FACTS:

All the former reservation land involved in this case passed into private ownership pursuant to the General Allotment Act of 1887. 24 Stat. 388. A row of seven allotments in the No Name Creek watershed was created in 1917. *Walton II*, 647 F.2d at 45. The United States holds allotments 892 to the north of Walton's property, and 901 and 903 to the south, in trust for the heirs of the original Indian allottees. The Tribe farms and irrigates these allotments under long-term leases. Allotment 526, which is also held in trust by the United States, is beneficially owned by the Tribe, but was properly excluded from the district court's allocation pursuant to the remand.[1]

Walton owns allotments 525, 2371 and 894, which he purchased in 1948. These allotments originally passed out of the ownership of Indian allottees between 1921 and 1925.

No Name Creek is a spring-fed creek which originates on allotment 892 and flows through Walton's allotments and the Indians' southern allotments into Omak Lake, a saline lake with no outlet. The creek and an underground aquifer underlying the Indians' northern allotments and the northern tip of Walton's allotment, number 525, constitute the No Name Creek Hydrological System.

In *Walton II*, we held that the United States reserved sufficient water, when the

---

1. Allotment number 526, the northernmost allotment, was excluded because water to irrigate it is potentially available from another source, thus water from the No Name System was not needed. *Walton II*, 647 F.2d at 49.

Colville Reservation was created, to allow the irrigation of all practicably irrigable acreage on the reservation. 647 F.2d at 48. We held also that a ratable share of this water reserved for irrigation passed to Indian allottees. This ratable share could in turn be conveyed to a non-Indian purchaser. However, the non-Indian purchaser's share is subject to loss if not put to use. *Id.*

In addition to water for irrigation, we held that sufficient water was reserved to allow the establishment of the Omak Lake Fishery and permit natural spawning of the Lahonton Cutthroat Trout. *Id.* at 48. This quantity of water, unrelated to irrigation, was not affected by the allotment of reservation lands and passage of title out of the Indians' hands.

We remanded the case to the district court to calculate the respective rights of the Tribe, Walton, and the individual allottees. The district court, in an unreported opinion, awarded 384 acre feet per year[2] to Walton, 428.8 acre feet per year to the Indian allottees for irrigation, and 187.2 acre feet per year to the Tribe for the trout spawning program. The Tribe appealed.

ANALYSIS:

### I. *Jurisdiction*

We have jurisdiction over this appeal under 28 U.S.C. § 1291. The district court's judgment and memorandum opinion were entered on August 31, 1983. On Monday, September 12, 1983, the Tribe served a copy of its motion for a new trial, Fed.R. Civ.P. 59(b), on Walton. The motion was filed the following day. An order was entered denying the motion on October 18, and the Tribe filed a notice of appeal on November 17, 1983.

■ The motion was served within the 10 day period required by Rule 59(b) and filed the following day and it was timely. *See Clipper Exxpress v. Rocky Mountain Motor Tariff,* 690 F.2d 1240 (9th Cir.1982), *cert. denied,* 459 U.S. 1227, 103 S.Ct. 1234,

75 L.Ed.2d 468 (1983). The time for filing a Notice of Appeal was tolled, Fed.R. App.P. 4(a)(4), and the Notice of Appeal was timely filed.

### II. *Law Applied*

■ Reserved rights are "federal water rights" and "are not dependent upon state law or state procedures." *Cappaert v. United States,* 426 U.S. 128, 145, 96 S.Ct. 2062, 2073, 48 L.Ed.2d 523 (1976); *see also United States v. Adair,* 723 F.2d 1394, 1411 n. 19 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). It is appropriate to look to state law for guidance, *see Colorado v. New Mexico,* 459 U.S. 176, 184, 103 S.Ct. 539, 545, 74 L.Ed.2d 348 (1982) (prior appropriation "guiding principle" for equitable apportionment between two prior appropriation states), although the "volume and scope of particular reserved rights ... [remain] federal questions." *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting *United States v. District Court for Eagle County,* 401 U.S. 520, 526, 91 S.Ct. 998, 1003, 28 L.Ed.2d 278 (1971)). This dispute involves relative shares of Colville's reserved waters, and is governed by federal law. We look to state law only for guidance.

### III. *Walton's Allocation*

■ The extent to which Walton succeeded to a share of the water reserved for irrigation when the Colville Reservation was created is determined by reference to the criteria set forth in *Walton II,* 647 F.2d at 51. On remand the district court "[was] without power to do anything ... contrary to either the letter or spirit of the mandate *construed in the light of the opinion of this court deciding the case." Firth v. United States,* 554 F.2d 990, 994 n. 3 (9th Cir.1977), quoting *Thornton v. Carter,* 109 F.2d 316, 319–20 (8th Cir.1940) (emphasis

---

**2.** An acre foot of water is that amount of water which will cover an acre of ground, one foot deep. It is equivalent to 43,560 cubic feet or 325,851 gallons. 1 *Waters and Water Rights* § 2.3 (R.E. Clark ed. 1967) (Clark).

added); *see also In re Beverly Hills Bancorp*, 752 F.2d 1334 at 1337–38 (9th Cir.1984). This is true even if the mandate was in error. *Firth*, 554 F.2d at 994.

## A. *Irrigable Acreage*

■ An Indian allottee's share of water reserved for purposes of irrigation is limited by the relationship between the number of irrigable acres owned and the number of irrigable acres contained within the reservation. For example, an allottee who owns ten percent of the total number of irrigable acres within a reservation, is entitled to ten percent of the water reserved for irrigation purposes when the reservation was created. This in turn creates an upper limit on the share that may be conveyed to a non-Indian purchaser. *Walton II*, 647 F.2d at 51.

■ The district court found that Walton owned 170 irrigable acres. This is a finding of fact which we uphold unless clearly erroneous. *United States v. Timberland Paving & Construction Co.*, 745 F.2d 595, 598 (9th Cir.1984). A finding of fact is clearly erroneous if a reviewing court is "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

The Tribe argues that almost all of Walton's land is waterlogged and not irrigable.[3] We need not determine whether Walton owns 170 acres of irrigable land. As we discuss more fully below, we conclude that Walton's predecessors exercised reasonable diligence in irrigating only 30 acres. If Walton owns at least 30 irrigable acres, irrigable acreage is no longer a limiting factor.

Walton's property beyond question contains at least 30 irrigable acres. Wilson W. Walton (Walton, Sr.) and W.B. Walton (Walton, Jr.) both testified they successfully farmed and irrigated 104–155 acres. Re-

3. The Tribe refers to a condition caused by a granitic lip which borders the south of Walton's

porter's Transcript, Aug. 9, 1982 (testimony of Walton, Sr.) and May 5, 1982 (testimony of Walton, Jr.). The Waltons' testimony was supported by that of Al Blomdahl, former Chief Soil Conservation Officer for the Okanogan Office of the United States Department of Agriculture Soil Conservation Service, who testified that Wilson Walton was named Regional Conservation Farmer of the Year in the early 1960's. Reporter's Transcript, May 5, 1982, p. 217.

## B. *Reasonable Diligence*

In *Walton II*, 647 F.2d at 51, we said:

On remand [the district court] will need to determine the number of irrigable acres Walton owns and the amount of water he appropriated with reasonable diligence in order to determine the extent of his right to share in reserved water.

The district court interpreted this to mean that Walton's diligence in applying water beneficially was the determinative factor in calculating his share of the reserved waters. The district court found that "Walton exercised reasonable diligence in irrigating a minimum of 104 acres," and calculated his allocation accordingly. Memo. Dec. at 5. The court then made alternative findings as to the diligence of the preceding owners of the property dating back to the immediate grantees of the original Indian allottees.

### 1. *Scope of the Mandate*

In *Walton II*, we established the criteria governing the transfer of reserved water rights from an Indian allottee to a non-Indian purchaser. Our mandate must be "construed in light of [our] opinion." *Firth*, 554 F.2d at 994 n. 3. In *Walton II* we said:

The non-Indian successor acquires a right to water being appropriated by the Indian allottee at the time title passes. The non-Indian also acquires a right, with a date-of-reservation priority date, to water that he or she appropriates with reasonable diligence after the passage of title. If the full measure of the Indian's

property, resulting in the saturation of a portion of Walton's property directly uphill from the lip.

reserved water right is not acquired by this means and maintained by continued use, it is lost to the non-Indian successor. *Walton II,* 647 F.2d at 51.

■ A careful reading leaves no doubt that the immediate grantee of the original allottee must exercise due diligence to perfect his or her inchoate right to the allottee's ratable share of reserved waters. This interpretation is supported by our reference to *Walton II* in subsequent cases. *See, e.g., United States v. Anderson,* 736 F.2d 1358, 1362 (9th Cir.1984) ("use it or lose it"); *United States v. Adair,* 723 F.2d 1394, 1417 (9th Cir.1983), *cert. denied,* ⸺ U.S. ⸺, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). Once perfected, the water right must be "maintained by continued use [or] it is lost." *Walton II,* 647 F.2d at 51.

The district court on remand was to "calculate the respective rights of the parties." *Id.* at 53. Calculating Walton's share required an investigation into the diligence with which the immediate grantee from the Indian allottees appropriated water, and the extent to which successor grantees, up to and including Walton, continued to use the water thus appropriated. Otherwise, any remote purchaser could appropriate enough water to irrigate all irrigable acreage with a priority date as of the creation of the Reservation. The reasonable diligence requirement of *Walton II* would be meaningless.

### 2. *Appropriation*

Walton's share of the Colvilles' reserved water is limited to that amount appropriated "with reasonable diligence after the passage of title" from the original Indian allottees (or their heirs), and "maintained by continued use" by each subsequent successor, including Walton. *Id.* at 51.

■ Under the doctrine of "prior appropriation", (followed by most western states, including Washington, *see* Morris, *Washington Water Rights—A Sketch,* 31 Wash.L.Rev. 243, 252–260 (1956)), "one acquires a right to water by diverting it from its natural source and applying it to some beneficial use." ˘*Colorado River Water*

*Conservation District v. United States,* 424 U.S. 800, 805, 96 S.Ct. 1236, 1240, 47 L.Ed.2d 483 (1976). To perfect an "appropriation," one must intend to appropriate a quantity of water, and diligently put it to a beneficial use. *See United States v. Big Bend Transit Co.,* 42 F.Supp. 459 (E.D. Wash.1941) and cases cited therein interpreting Washington law.

■ If diligently applied, the priority date of the water right relates back to the initial diversion. *See, e.g., Longmire v. Smith,* 26 Wash. 439, 448, 67 P. 246, 249 (1901), 5 *Clark, supra,* § 409.3 (1972). The tests developed to determine whether or not an appropriator has been sufficiently diligent in applying water to a beneficial use to justify relating the priority date back to the initial diversion are appropriate to determine how much water Walton's predecessors appropriated with reasonable diligence, after the passage of title.

### 3. *Intent/Due Diligence*

■ An initial diversion of at least some water is an important indication of intent. *See* Clark, *supra,* § 409.2. When water is diverted for irrigation purposes, and the amount continuously and gradually increased, an intent to appropriate the quantity eventually used may logically be inferred. *See, e.g., In Re Waters of Doan Creek,* 125 Wash. 14, 25, 215 P. 343, 347 (1923), *In Re Water Rights in Alpowa Creek,* 129 Wash. 9, 224 P. 29 (1924). This could include enough water to irrigate all irrigable acres. *See Doan Creek,* 125 Wash. at 25, 215 P. at 347 (dicta). Thus, intent and due diligence are necessarily interrelated.

The district court found that the owners between the Indian allottees and Walton exercised "diligence in beneficially applying water for agricultural purposes to the maximum extent reasonably possible given prevailing economic and technological conditions." Mem.Dec. at 7.

The court apparently inferred that these owners intended to appropriate enough water to irrigate at least 104 acres, as soon as

technologically feasible. We find this conclusion unsupported by the record.

The amount of land irrigated remained fairly constant, throughout the 23–27 year period following purchase by the Whams, the first non-Indian purchasers. Walton cites *In Re Alpowa Creek*, for the proposition that due diligence is determined in light of the attendant circumstances. However, in *Alpowa*, "the amount of ... irrigation ... gradually but surely increased." 224 P. at 31. *See also Offield v. Ish*, 21 Wash. 277, 57 P. 809, 810 (1899) (amount of acreage steadily increased). In *Doan Creek*, the court refused to grant water rights to the full 125 acres under irrigation because irrigation grew steadily to 60–70 acres but remained constant at that level throughout the 1890's, limiting the right to 60 acres.

Walton argues that each preceding owner has farmed the water-saturated or subirrigated portion of his allotments, near the granitic lip. This, he urges, demonstrates reasonable diligence for purposes of perfecting a reserved right to water for irrigating other areas of his land.

We find his argument unpersuasive. The record indicates that this same acreage is subirrigated today. *See, e.g.*, Reporter's Transcript, May 7, 1982, p. 612 (testimony of Walton, Sr.). Thus, assuming arguendo that the subirrigated acreage may give rise to an entitlement, it is being satisfied by the present subirrigation. To award additional water on this basis would result in a double allocation.

We are unable to infer an intent to appropriate an increasing amount of water from over two decades of relatively static irrigation practices.[4] Walton's share of the reserved water is thus limited to the amount utilized for irrigation throughout this period.

The district court found that the original non-Indian purchasers, the Whams, "irri-

gated about 30 acres employing gravity flow rill method as well as a small gasoline powered pump," and that they continued to irrigate the same amount of land until Walton bought the land in 1948. Mem. Dec. at 2–3.

There is evidence that the Whams, the first non-Indian purchasers of Allotments Nos. 2372, 894 and 525, in 1921, 1923 and 1925 respectively, made an initial diversion of some quantity of water within a reasonable time after passage of title. Reporter's Transcript, May 5, 1982, p. 180 (testimony of Carol Wham Johnson). Witnesses testified that portions of the property were irrigated throughout the period leading up to the purchase by Walton. *E.g.*, Reporter's Transcript, May 5, 1982, pp. 136–138 (testimony of Mr. Hampson), pp. 177–184 (testimony of Mrs. Wham Johnson).

There may be periods about which the evidence concerning the acreage actually irrigated is sketchy or conflicting. However, absolute certainty is an impossibility when we are dealing with witnesses' attempts to remember events of 30 to 40 years ago.

We affirm the trial court's finding that sufficient water to irrigate 30 acres was appropriated with reasonable diligence by the original non-Indian purchasers and continually used by each subsequent owner, including Walton. Walton's right to this amount of water has a priority date as of the establishment of the Reservation.

### 4. *Beneficial Use*

 "Water duty" is the "major conceptual tool for implementing beneficial use" in western water law. *United States v. Alpine Land & Reservoir Co.*, 697 F.2d 851, 854 (9th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). "It is that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied

---

**4.** The district court considered the political and economic conditions in the United States during this period, (e.g., The Great Depression, World War II), and the effect of new technology, (*e.g.*, the advent of aluminum pipe). We do not reach the issue whether the court properly considered these circumstances. We find the record lacking sufficient evidence that the non-Indian owners preceding Walton had the requisite intent to irrigate any additional acreage.

to any given tract of land ... to produce therefrom a maximum amount of such crops as ordinarily are grown thereon." *Id.* (quoting *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 584–85, 272 P.2d 629, 634 (1954)).

■ The district court utilized a water duty of four acre feet per year to quantify Walton's beneficial use of water. This figure was adopted from *Walton I,* 460 F.Supp. at 1330, where it was applied to the land of the other allottees, based on testimony ranging from "4.8 acre feet to 3.6 acre feet" and covering property throughout the Okanogan Valley and the No Name Creek Basin.

The Tribe challenges its application to Walton's property because of the ground saturation caused by the granitic lip that borders the south of Walton's property. The nature of Walton's land was hotly contested. The trial judge adopted four acre feet per year as the "water duty" after considering all the evidence. After a careful review of the record, we cannot say this is clearly erroneous. *Cf. Alpine Land,* 697 F.2d at 851 (court upheld factual determination of water duty based on controverted expert testimony).

## IV. *Indian Allottees*

■ The district court found that the Indian allottees owned 166.6 irrigable acres. Utilizing a water duty of four acre feet per year, 666.4 acre feet per year is their share of the reserved waters. However, the district court awarded only 428.8 acre feet per year because the allottees, through leases to the Tribe, were irrigating only 107.2 acres. Its application of a legal standard, deduced from *Walton II,* to essentially undisputed facts is reviewable de novo. *See In Re J.A. Thompson & Sons, Inc.,* 665 F.2d 941, 951 (9th Cir.1982).

Reducing the Indian allottees' share for non-use is in direct conflict with *Walton II,* 647 F.2d at 51. The court should have allocated the full 666.4 acre feet per year to the Indian allottees.

## V. *Omak Lake Fishery*

■ The court accepted the figures presented by Dr. Koch, *see* Mem.Dec. at 12, which translated into 350 acre feet per year for the needs of the Tribal Fishery. *See* Reporter's Transcript, May 7, 1982 at p. 587. However, the court allocated only 187.2 acre feet per year to the fishery. To reach this figure the court added Walton's allocation (384 acre feet per year)[5] to the Indian allottees' allocation (428.8 acre feet per year) and arrived at 812.8 acre feet per year as the amount in use. Subtracting this from the estimated amount available in the No Name Hydrological System, 1,000 acre feet per year, the court arrived at 187.2 acre feet per year. The resultant 187.2 acre feet per year was characterized as "available for other uses," Mem.Dec. at 9, and allocated to the Tribal fishery.

*Walton II* is clear. The Tribe has a reserved right "to sufficient water to permit natural spawning of the trout." *Walton II,* 647 F.2d at 48, and the Indian allottees have a right to share in the reserved water, based on the irrigable acreage owned, without any reduction for non-use. *Id.* at 51.

The district court was obligated to carry out the mandate of *Walton II,* "whether correct or in error." *Firth,* 554 F.2d at 994. *See also Stevens v. F/V Bonnie Doon,* 731 F.2d 1433, 1435 (9th Cir.1984) (mandate controlling as to all matters within its compass). In *Walton II,* we specifically addressed the potential inequity of "open-ended water rights," but said quanti-

---

**5.** The district court calculated Walton's share by adding 416 acre feet per year (four acre feet per year × 104 acres), a figure representing his full entitlement, to the Indian allottees' full entitlement, 666.4 acre feet per year (166.6 acres × four acre feet per year). Since the resultant figure, 1082.4 acre feet per year, was greater than the estimated amount available, 1,000 acre feet per year, each share was proportionately reduced. Walton's 384 acre feet per year was his share after the reduction. The Indian allottees' reduction apparently played no further role in the calculation of their final allocation.

fication, not limitation, was the answer. *Walton II,* 647 F.2d at 48.

We held that "the purposes for which the reservation was created governed the quantification of reserved water, but not the use of such water." *Id.* at 48. As support for this proposition, we quoted the Special Master in *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), who said "... *the decree* [establishing a reserved water right] *establishes a property right which the United States may utilize or dispose of for the benefit of the Indians as the relevant law may allow.*" Report from Simon H. Rifkind, Special Master, to the Supreme Court 265–66 (December 5, 1960) (emphasis added).

The district court treated the italicized phrase as a further hurdle which the Tribe needed to clear before becoming entitled to an allocation of reserved water for the Omak Fishery. It held that the validity of an allocation to the fishery depended on the existence of "relevant law" in addition to our mandate in *Walton II* which would "allow the Tribe to dispossess its members, or other persons succeeding to the vested rights of those members, of an important property right." Mem.Dec. at 13. This is incorrect.

The phrase, read in context, refers only to potential limitations on the utilization of water once rights have been quantified and decreed. It confirms what common sense indicates. A tribe's freedom to use reserved water for an alternative purpose remains subject to any otherwise applicable legal restraint.

The district court feared that the Tribe, by utilizing its *Winters* rights for the Omak Fishery, would dilute the water rights of the Indian allottees and their successors (*e.g.,* Walton). This merely reflects the tension between the doctrines of prior appropriation and Indian reserved rights. Where reserved rights are properly implied, they arise without regard to equities that may favor competing water users. *See Cappaert v. United States,* 426 U.S. 128, 138–39, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976). Where, as here, all parties derive their rights and concomitant priority dates from reserved rights, and there is an insufficient water supply, the result is mandated by *Walton II:* "the amount available to each claimant should be reduced proportionately." *Walton II,* 647 F.2d at 51. The position of the parties is analogous to that of any appropriators with the same priority date, faced with a water shortage.

The Tribe is entitled to its full allocation, 350 acre feet per year, subject to any pro rata adjustment necessitated by a lack of available water.

CONCLUSION:

We have considered the Tribe's objections to the treatment of the surface and ground waters of No Name Creek Basin as one hydrological unit, and find them without merit.

We reject also the Tribe's challenge to the use of 1,000 acre feet per year as an estimate of the water available. If this figure is inaccurate, each party's allocation may be adjusted proportionately.

On remand, the district court will allocate the reserved water among the parties, in accord with our opinion: 120 acre feet per year to Walton; 666.4 to the Indian allottees; and 350 to the Tribe's fishery. Since all parties have a priority date as of the creation of the Reservation, each should bear a proportionate share of any adjustment required by shortages of water.

Reversed and remanded. The parties will bear their own costs on this appeal.