2002 WY 89

In re the GENERAL ADJUDICATION OF
ALL RIGHTS TO USE WATER IN the
BIG HORN RIVER SYSTEM and all
other Sources, State of Wyoming,

Jack Appleby, Brad Bath, Jim Buline,
Leah Heathman, Hornecker Livestock,
Inc., Ralph Hornecker, Tim Schell,
Ralph Urbigkit, Ralph F. "Rusty" and
Kathy Urbigkit, and Donald Van Riper,
Appellants (Petitioners).

No. 00–296.

Supreme Court of Wyoming.

June 14, 2002.

Representing Eastern Shoshone Tribe: John Schumacher of Law Office of John Schumacher, Ft. Washakie, WY.

Representing United States of America: John C. Cruden, Acting Assistant Attorney General, Environment & Natural Resources Division; John R. Green, Interim United States Attorney, and Carol Statkus and Thomas Roberts, Assistant United States Attorneys, Cheyenne, WY; Lynn Johnson, Sean Donahue, and Jeffrey C. Dobbins, Attorneys, Department of Justice, Washington, DC; and Richard Aldrich, Field Solicitor, Office of the Solicitor, United States Department of the Interior, Billings, MN.

Before LEHMAN, C.J.; GOLDEN, KITE, and VOIGT, JJ.; and E. JAMES BURKE, D.J.

KITE, Justice.

[¶ 1] The appellants own lands within the Big Horn River System and claim federal reserved water rights as a result of their acquiring properties from Indian allottees. These claims are known as *"Walton"* claims based on the federal court cases which first identified them. To qualify, *Walton* claimants must demonstrate their lands were irrigated by their Indian allottee predecessors or the first non-Indian successors irrigated the lands within a reasonable time after they were conveyed. The district court denied these appellants' claims (unsuccessful claimants) finding they failed to show beneficial use of water within a "reasonable time" because they relied upon the construction of the Wind River Irrigation Project to make the water available to their lands and the project was not completed until approximately ten to thirty years after transfer of the allotments. Yet, the district court approved other *Walton* claims where transfers of the allotments to successor non-Indians occurred significantly later and closer in time to the completion of the irrigation project. We reverse in part and remand with instructions that unsuccessful claimants who can demonstrate beneficial use within a reasonable time after the federal project facilities became available to their properties are entitled to a reserved right. We affirm the district court's determination that the "reasonable

Representing Appellants: Sky D Phifer of Phifer Law Office, Lander, WY.

Representing State of Wyoming: Thomas J. Davidson, Deputy Attorney General, Water and Natural Resources Division; Keith S. Burron, Special Assistant Attorney General, of Associated Legal Group, LLC, and Brian C. Shuck, Special Assistant Attorney General, of Dray, Thomson & Dyekman, P.C., Cheyenne, WY.

Representing Northern Arapaho Tribe: Richard M. Berley of Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, WA.

time" to establish beneficial use begins to run when the property first passes from allotment status and is not restarted by a subsequent purchase by an Indian. We also affirm the special master's decision concerning the appropriate weight to be given a proof of appropriation executed in 1943 as evidence of actual irrigation prior to 1910.

## FACTS

[¶ 2] This appeal arises out of the continuing, comprehensive adjudication of the water rights in the Big Horn River System initiated in 1977 in accordance with the provisions of Wyo. Stat. Ann. § 1–37–106 (Lexis-Nexis 2001) and the McCarran Amendment, 43 U.S.C. § 666 (1976). The purpose of the adjudication was to resolve the issue of what water rights the federal government reserved for the Wind River Indian Reservation's benefit. *See Riverton Valley Irrigation District v. Big Horn Canal Association,* 899 P.2d 848, 850 (Wyo.1995) (*Big Horn V*). This immense task resulted in more than 20,000 water rights claims being winnowed down to the seventeen disputed claims now before this court. *Id.* Through prior appeals to this court, we have provided summaries of the factual and legal background of this litigation. *See State v. Owl Creek Irrigation District Members,* 753 P.2d 76, 83–86 (Wyo. 1988), *cert. granted in part,* 488 U.S. 1040, 109 S.Ct. 863, 102 L.Ed.2d 987, *aff'd sub nom. Wyoming v. United States,* 492 U.S. 406, 109 S.Ct. 2994, 106 L.Ed.2d 342 (1989) (*Big Horn I*); *Alexander v. United States,* 803 P.2d 61 (Wyo.1990) (*Big Horn II*); *In re General Adjudication of All Rights to Use Water in the Big Horn River System,* 835 P.2d 273 (Wyo.1992); *Big Horn V,* 899 P.2d 848.

[¶ 3] In the initial appeal, *Big Horn I,* 753 P.2d 76, this court was called upon to determine whether non-Indian water users could claim a federal reserved right with an 1868 priority date as successors in interest to Indian allottees who received fee lands under the General Allotment Act of 1887 (now 25 U.S.C. §§ 331–358) and reserved water rights through the 1868 Treaty of Fort Bridger, which established the Wind River Indian Reservation. *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). Relying on the authority of *United States ex rel. Ray v. Hibner,* 27 F.2d 909 (D.Idaho 1928), and *Colville Confederated Tribes v. Walton,* 647 F.2d 42 (9th Cir. 1981) (*Walton II*), we approved *Walton* rights and held non-Indian purchasers of land from Indian allottees do obtain reserved water rights with an 1868 priority date for the practicably irrigable acreage they can show was irrigated by their Indian predecessors or put under irrigation within a reasonable time after transfer from allotment status. *Big Horn I,* 753 P.2d at 112–14. These claims became known as *Walton* claims based upon a series of Ninth Circuit Court of Appeals cases dealing with rights of non-Indian purchasers of allotments. *Colville Confederated Tribes v. Walton,* 460 F.Supp. 1320 (E.D.Wash.1978) (*Walton I*); *Walton II,* 647 F.2d 42; *Colville Confederated Tribes v. Walton,* 752 F.2d 397 (9th Cir.1985) (*Walton III*). The *Big Horn I,* 753 P.2d 76, holding was further clarified in *Big Horn II,* 803 P.2d 61.[1] The matter was remanded with instructions that claimants be granted a reserved right if they met the burden of proof that their lands were either irrigated by their Indian predecessors or placed into irrigation within a reasonable time after the lands were transferred out of Indian ownership.

[¶ 4] Much of the land within the Wind River Indian Reservation could not be irrigated without construction of substantial storage and conveyance structures. In 1905, H.E. Wadsworth, superintendent and special disbursing agent of the Shoshone Agency, an employee of the Bureau of Indian Affairs, filed multiple state diversion and appropriation permit applications, covering over 123,-000 acres of reservation land. These state applications were made preparatory to the United States government's development of the Wind River Irrigation Project, which pro-

---

1. "Both Indian allottees and non-Indian successors of Indian allottees are entitled to reserved water rights with treaty priority dates for the practicably irrigable acreage they are able to

demonstrate was either irrigated by their Indian predecessors or put under irrigation within a reasonable time after it was conveyed." *Big Horn II,* 803 P.2d at 70.

posed construction of storage and conveyance structures to allow irrigation of reservation lands. Throughout the development of the project, from 1905 through the early 1960s, the United States requested, and the state engineer granted for "good cause shown," numerous extensions of time to put the water initially claimed in 1905 to beneficial use pursuant to Wyo. Stat. § 41–4–506. Progress on the project, which entailed the construction of a huge network of laterals, canals, and water storage facilities, was steady and continuous yet protracted due to the sheer enormity of the task, incremental appropriation and provision of federal funds, and intervening world events.

[¶ 5] In the adjudication of over 200 of these *Walton* claims, only the eleven claimants, the subjects of this appeal, were denied reserved water rights for failure to show beneficial use of the water either by their Indian allottee predecessors or within a reasonable time after transfers of ownership. The special master acknowledged in her report that, absent the United States' assistance in constructing the Wind River Irrigation Project, irrigation would not have been possible on any of the *Walton* claimants' lands.

[¶ 6] The special master and the district court referred to the unsuccessful claimants as the "tacking claimants" because of their assertion they were entitled to rely on the efforts of the United States in developing the federal irrigation project to establish their reasonable diligence for *Walton* rights.[2] The unsuccessful claimants further asserted that, having acquired the reserved water rights through the doctrine of relation back, they should also be entitled to an 1868 reserved water rights priority date like the successful claimants.

[¶ 7] The unsuccessful claimants' properties passed out of allotment status during the period of 1900–1920, substantially earlier than the successful claimants' properties. The federal project did not begin delivering

water for use until the 1930s and 1940s. Because of the early transfer from allotment status, the period between the transfer and actual use of the project waters by the unsuccessful claimants was ten to twenty years as compared to a shorter period for the successful claimants who obtained title to the Indian lands much closer in time to the federal project's completion. The special master's conclusions, adopted by the district court, determined the unsuccessful claimants failed to demonstrate beneficial use within a reasonable time after the lands were transferred from the allottees in order to retain the federal reserved water rights they had acquired upon transfers of the allotments. Instead, the special master and district court concluded the unsuccessful claimants held state water rights which were entitled to a 1905 priority based on relation back of the state permit applications.

[¶ 8] Eleven unsuccessful claimants have appealed the district court's order, which affirmed and adopted the special master's report rejecting their claims. The appeal also raises two additional questions regarding (1) the legal effect of reacquisition of land by an Indian after non-Indian ownership and (2) the special master's decision to reject a sworn proof of appropriation as credible evidence of timely irrigation of land.

## DISCUSSION

[¶ 9] The parties filed a Stipulation to Issues on Appeal on February 7, 2001, to "identify the particular issues . . . so as to eliminate the possibility of collateral issues being raised by the parties in the course of briefing, and to enable the parties to compile the documents . . . to be included in the joint appendix." The parties agreed the three issues set out in the document were "the *only* issues before the Court for purposes of the pending appeal." (Emphasis added.)

---

**2.** We decline to use the "tacking claimants" and "tacking claim" terminology. As will be seen through the course of the Discussion section of this opinion, we are of the belief the majority of the successful claimants also relied on the United States government's diligence in constructing the

Wind River Irrigation Project to establish their 1868 priority date. For the sake of clarity and accuracy, we prefer to refer to the various *Walton* claimants discussed in this opinion as the "successful claimants" and the "unsuccessful claimants."

Consistent therewith, we address these issues:[3]

A. Were the special master and district court correct in concluding the tacking claimants could not rely on the United States' diligence in developing the Wind River Irrigation Project to "tack" or "piggy-back" to a federal reserved priority date of 1868 but could benefit from the federal project's state permit priority date of 1905?

B. Does the computation of the "reasonable time" element of a *Walton* claim begin to run when the allotted property first passes out of allotment status or, in the circumstance of land later repurchased by an Indian owner, from the date title transfers from the most recent Indian owner to a non-Indian?

C. Did the district court err in accepting the special master's determination that a proof of appropriation sworn under oath in 1943 did not provide convincing evidence of irrigation of parcels prior to 1910 due to the thirty-three-year time lapse?

The first two issues clearly present legal, as opposed to factual, questions, and our standard of review neither affords deference nor binds this court to the district court's decision. *Eklund v. PRI Environmental, Inc.*, 2001 WY 55, ¶ 10, 25 P.3d 511, ¶ 10 (Wyo. 2001); *Ruwart v. Wagner*, 880 P.2d 586, 590 (Wyo.1994); *City of Laramie v. Hysong*, 808 P.2d 199, 202 (Wyo.1991). The third issue puts a factual finding in question, and we will not disturb a specific factual finding unless it is clearly erroneous or against the great weight of the evidence. *Barton v. Barton*, 996 P.2d 1, 3 (Wyo.2000).

### A. Can *Walton* Claimants Rely Upon the Wind River Irrigation Project as Evidence of Diligence?

[¶ 10] Federal reserved water rights were appurtenant to the allotments when they were sold, and the unsuccessful claimants argued they should be allowed to retain those rights because the properties were irrigated within a reasonable time and with due diligence through the federal government's development of the Wind River Irrigation Project. They contend the district court erred when it concluded as a matter of law they could not rely upon the construction of the Wind River Irrigation Project as evidence of due diligence.

[¶ 11] The district court's order rejecting the unsuccessful claimants' claims as a matter of law because they relied upon completion of the irrigation project seems misguided for several reasons. First, the federal law

---

**3.** The issues as framed in the stipulation cited to various numbered paragraphs and pages of the Amended Judgment and Decree (August 30, 2000); the Judgment and Decree (July 30, 1992); and Special Master Dolan's May 4, 1992, Report. The document references have been removed, through paraphrasing, to make the relevant questions more readily discerned. The original language provided:

Issue 1 (tacking): Are the *Amended Judgment and Decree's* (August 30, 2000) Findings of Fact Nos. 5, 6, 7, and 8 and Conclusions of Law Nos. 5 (reasonable time element only) and 6, correct with respect to Claim Nos. 243, 244, 262, 286, 287, 288, 291, 292, 293, 324, 351, 371, 375, and 379? *See Exhibit "A" attached hereto for citations of the referenced findings and conclusions.* And;

Are the *Judgment and Decree's* (July 30, 1992) Finding of Fact No. 10, Conclusion of Law No. 1 (last sentence only), and the Judgment and Decree Ruling Nos. 1 (last sentence only) and 11 correct with respect to Claim Nos. R2 (Hornecker Livestock, Parcels 1 and 4), R8 (DHB & Co. and PLB & Co., Parcels 2, 3, and 5) and R16 (Ralph F. "Rusty" and

Kathy Urbigkit, Parcel 2)? Note: In this appeal, no party contests the rule of law established in the first two sentences of said Conclusion of Law No. 1 and Judgment and Decree Ruling No. 1, but each party reserves the right to argue the application of said ruling to the claims referenced under this Issue No. 1. *See Exhibit "A" attached hereto for citations of the referenced findings, conclusions, and Judgments.*

Issue 2 (recent Indian owner): Are the *Amended Judgment and Decree's* (August 30, 2000) Finding of Fact No. 9 and Conclusion of Law No. 7, set forth below, correct with respect to Claim Nos. 286, 287, and 288? *See Exhibit "A" for citations of the referenced findings and conclusions.*

Issue 3 (credible evidence): Was the *Judgment and Decree's* (July 30, 1992) adoption of Special Master Dolan's recommendation to deny *Walton* water rights with respect to Claim No. R8 (DHB & Co. and PLB & Co., Parcels 2, 3, and 5) correct, (specifically referring to the findings and conclusions found at pp. 32–38 of Master Dolan's May 4, 1992 Report)? *See Exhibit "B" attached hereto, containing pp. 32–38 of said Report.*

of reserved rights relies upon the reasonable diligence standard established in state prior appropriation law to determine the validity of *Walton* right claims, and reliance upon the irrigation project met that standard. Second, as a matter of law, the doctrine of relation back deems irrigation commenced in 1905 upon the filing of the permit applications, and this legal fiction is capable of constituting diligent exploitation of the reserved rights. If the claimants are legally considered to have commenced appropriation in 1905, they were appropriating water in the eyes of the law when they acquired the allotments. Third, the evidence is undisputed that the irrigation project's proponents recognized the value of the Indian water rights and acted on behalf of the landowners, both Indian and non-Indian, to insure state law was followed to protect those rights. As a matter of law, development of the project can be considered as having been done on behalf of the allottees and their successors. Fourth, Wyoming law is clear that irrigation projects such as this are favored, and the courts have allowed significant time for such projects to be completed while protecting the water rights upon which they rely. Finally, equitable treatment of all the *Walton* claimants demands that those who acquired their lands early should not be penalized for that fact when claimants who acquired their lands later demonstrated no more diligence and relied on the irrigation project in the same fashion. While we agree with the arguments of the Indian tribes and the federal government that *Walton* rights must be narrowly construed, that is so because of the disruptive impact of reserved rights on the administration of water rights in general. The fact is, the courts have created these rights and established the rules for determining their scope. Now, we are bound to apply those rules with reason and fairness.

**B. What Is the Standard for Reasonable Diligence for *Walton* Right Claims?**

 [¶ 12] In order to resolve what the proper test is for determining "reasonable

diligence" sufficient to qualify for a *Walton* right, we must examine the legal and historical context of reserved rights. All the *Walton* claimants acquired their Indian predecessors' shares of the federally reserved water rights. Reserved rights is a doctrine by which "the federal government reserves public lands for particular purposes, it also impliedly reserves sufficient water to effectuate those purposes." 4 Waters and Water Rights § 37.01 at 218 (Robert E. Beck ed., 1996 Repl.). Having a unique nature, these

"reserved" water rights are unlike riparian [4] rights or prior appropriation rights, although they contain elements of both. For example, like riparian rights, reserved rights are appurtenant to land; that is, land ownership is the basis of the right. Also like riparian rights, reserved rights are not lost by nonuse. But reserved water can be used on nonriparian lands. And like prior appropriation rights, reserved rights have priority dates which reflect the security of the right.... However, the priority date for reserved rights is the date of the reservation or earlier, not the date of diversion, as in the case of most appropriation rights.

The ***chief characteristic of reserved rights is that they are federal rights,*** grounded on the (mostly implied) intent of the federal government to reserve water for its purposes. This characteristic serves to distinguish reserved rights from both prior appropriation and riparian rights.

*Id.* at 218–19 (emphasis added).

[¶ 13] The United States Supreme Court first recognized reserved rights for Indian reservations in *Winters,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340. Therein, the Supreme Court concluded the Indians reserved certain water rights necessary to accomplish the purpose of the treaty. Although no specific Congressional intent can be cited, the courts have agreed that Congress would have

---

**4.** Riparian rights are

the rights of the owners of lands on the banks of watercourses, relating to the water, its use, ownership of soil under the stream, accretions, etc. Term is generally defined as the right

which every person through whose land a natural watercourse runs has to benefit of stream as it passes through his land for all useful purposes to which it may be applied.

Black's Law Dictionary 1327 (6th ed.1990).

intended such a reservation. 207 U.S. at 576, 28 S.Ct. 207. Ultimately, the courts recognized the rights of individual Indians who had been allotted ownership of specific tracts of land within the reservation the right to "just and equal" distribution of the reserved water. *United States v. Powers*, 305 U.S. 527, 530, 59 S.Ct. 344; 83 L.Ed. 330 (1939). That right could not be lost by nonuse and was appurtenant to the allottee's land.

[¶ 14] Thereafter, the right of the individual Indian allottees to convey their lands for full value with the appurtenant reserved water rights to non-Indians was recognized. *Hibner*, 27 F.2d 909; *Skeem v. United States,* 273 F. 93 (9th Cir.1921). The court in *Hibner* found the transferred reserved water right had a different status because the purpose of protecting the Indian does not apply to a non-Indian. The non-Indian,

> as soon as he becomes the owner of the Indian lands, is subject to those general rules of law governing the appropriation and use of the public waters of the state, and would, as grantee of the Indian allotments, be entitled to a water right for the actual acreage that was under irrigation at the time title passed from the Indians, and such increased acreage as he might with reasonable diligence place under irrigation, which would give to him, under the doctrine of relation, the same priority as owned by the Indians; otherwise, the application of any other rule would permit such grantee for an indefinite period to reclaim the balance of his land and withhold the application of the water to a beneficial use, which is against the policy recognized in the development of arid lands.

27 F.2d at 912. Thus, it can be clearly seen, from the beginning of the courts' recognition that reserved rights could be transferred to non-Indians, the overriding concern was that the rights be "subject to those general rules of law governing the appropriation" to ensure their prompt utilization consistent with the "policy recognized in the development of arid lands." *Id.* That doctrine of prior appropriation, which encouraged water development in the arid West, was embraced by, and in fact born in, the State of Wyoming. Robert B. Keiter & Tim Newcomb, The Wyo-

ming State Constitution, A Reference Guide at 9–10 (1993).

[¶ 15] The only further articulation of the scope and nature of the reserved rights acquired by non-Indian successors to allottees is contained in the three *Walton* decisions of the Ninth Circuit Court of Appeals. *Walton I,* 460 F.Supp. 1320; *Walton II,* 647 F.2d 42; *Walton III,* 752 F.2d 397. The controlling maxim of those cases is the elusive, unarticulated but "presumed" Congressional intent. Unfortunately, "[t]here is nothing to suggest Congress gave any consideration to the transferability of reserved water rights. To resolve this issue, we must determine what Congress would have intended had it considered it." *Walton II,* 647 F.2d at 49. The court then concluded Congress did not intend to limit the individual Indian's right to transfer the reserved water right. We suggest Congress also likely intended, once transferred to a non-Indian, that right would be subject to the generally applicable prior appropriation laws of the respective state. *Hibner,* 27 F.2d at 912.

[¶ 16] A fundamental difference between a reserved right held by an Indian and one transferred to a non-Indian was that the Indian did not lose the right by nonuse. In contrast, under the prior appropriation doctrine adopted throughout the arid West, nonuse can affect the termination of a water right. The concept that these rights are created by federal law to protect the intent of the original treaties runs throughout the reserved rights cases, and, while in Indian hands, reserved rights cannot be abridged or diminished by state law unlike a water right held by a non-Indian. So, it is not surprising that the Ninth Circuit Court of Appeals found the non-Indian must exercise the reserved right he receives upon purchasing Indian land to which the right is appurtenant by appropriating it "with reasonable diligence after the passage of title." *Walton II,* 647 F.2d at 51. This requirement balanced the allottee's right to transfer with the non-Indian's obligation to comply with existing state law and policy to diligently put the right to use. Congress could not have intended the non-Indian to enjoy the perpetual nature of a right reserved to the Indian by

treaty. While it is not necessary to speculate, it does appear logical that, irrespective of the standards articulated by the *Walton* cases, the non-Indian would be required to use reasonable diligence to maintain any right acquired under state law in any event. It is significant no federal court considering this issue has suggested Congress would have intended to impose further restrictions on the transferred reserved right than already existed under state law.

[¶ 17] What guidance do we have, then, to determine what constitutes reasonable diligence in this context? In the series of *Walton* cases, Mr. Walton claimed federal reserved rights on 170 acres which had been acquired by his predecessor from an allottee. Ultimately, the court found only thirty of those acres had been diligently irrigated over the years. No specific number of years was announced as constituting a "reasonable time" or "reasonable diligence." We believe it is significant the Ninth Circuit Court of Appeals held "[i]t is appropriate to look to state law for guidance" to determine diligence. *Walton III*, 752 F.2d at 400. Further, it was stated:

> If diligently applied, the priority date of the water right relates back to the initial diversion. The tests developed to determine whether or not an appropriator has been sufficiently diligent in applying water to a beneficial use to justify relating the priority date back to the initial diversion are appropriate to determine how much water Walton's predecessors appropriated with reasonable diligence, after the passage of title.

752 F.2d at 402 (citations omitted). That statement clearly reflects the federal court's determination that, if an appropriator was diligent enough to justify the application of the doctrine of relation back recognized in prior appropriation law, he demonstrated sufficient diligence to successfully preserve a *Walton* claim. The federal court concluded, citing Washington Supreme Court cases, Mr. Walton did not demonstrate the original irrigation of thirty acres was increased sufficiently to meet the state law standard for enlargement through gradual but sure increases which manifested an original intent to appropriate an increasing amount of water. *Walton III*, 752 F.2d at 402–03 (citing *In Re Waters of Doan Creek*, 125 Wash. 14, 215 P. 343, 347 (1923); *In Re Water Rights in Alpowa Creek*, 129 Wash. 9, 224 P. 29 (1924)). Clearly, had Mr. Walton met the standard for diligence established by state law, the court would likely have recognized a larger reserved right for him.

[¶ 18] No precedent exists in state or federal law regarding how reasonable diligence in *Walton* claims should be evaluated when a large, multi-year irrigation project is under construction at the time of the transfer of the allotment and must be built in order to allow irrigation of the former Indian lands. This court has adopted and relied heavily on the above federal court precedent concerning the existence and the scope of federal reserved rights, including *Walton* rights. We continue to do so in resolving the proper standard for reasonable diligence in the context of those rights. That clear precedent leads us back to our own statutes and case law to determine whether relying upon the construction of a permitted, large irrigation project, when no other means of irrigation is available, constitutes reasonable diligence in putting the lands into irrigation.

## C. Legal Effect of Relation Back to 1905

[¶ 19] No one disputes these unsuccessful claimants were within the Wind River Irrigation Project. The permits filed in 1905 constituted the initial step in perfecting water rights for their lands under state law. So long as that project proceeded at a reasonable pace and received proper extensions from the state engineer allowing additional time for the project to be completed and so long as the claimants ultimately irrigated their lands with project waters, the application of the doctrine of relation back directs these claimants be legally considered as having begun irrigation in 1905.

[¶ 20] The doctrine of relation back has been long recognized in Wyoming jurisprudence in both case law and statute. *See Campbell v. Wyoming Development Co.*, 55 Wyo. 347, 100 P.2d 124 (1940); *Van Tassel Real Estate & Live Stock Co. v. City of Cheyenne*, 49 Wyo. 333, 54 P.2d 906 (1936);

*Moyer v. Preston,* 6 Wyo. 308, 44 P. 845 (1896); Wyo. Stat. Ann. §§ 41–4–506, 41–3–401(a), 41–4–512 (LexisNexis 2001). The doctrine invokes the "principle by which, when an act is done at one time, it is considered, by a fiction of law, as if done at some antecedent time." 2 Clesson S. Kinney, A Treatise on the Law of Irrigation and Water Rights § 743 at 1284–85 (2d ed.1912). The courts adopted the doctrine solely for the purpose of justice founded in law, reason, and convenience based on broad equitable principles. *Id.* at 1285. Water law borrowed this property doctrine to protect the appropriator against intervening filings that could subordinate his expected priority between the filing of the permit for an appropriation and the actual physical appropriation. A. Dan Tarlock, Law of Water Rights and Resources § 5:62 at 5–104 (2001). Hence, "[p]riority is determined from the date of the manifestation of intent, not the date of actual application of the water to beneficial use." *Id.*

[¶ 21] Relation back has always been a flexible doctrine generally used to protect the parties' expectations when an unexpected event occurs. *Id.* at 5–105. Its application in water law has been necessary to stimulate investment in water development. As it was initially developed, relation back was applied to small ditches and less complex means of water development. *Id.* Considerable delays in putting water to use suggested speculation and could result in loss of early priority. *Id.* However, contemporary water projects often entail extended planning, financing, and construction lead times, and, without application of the relation back doctrine, the security of the project's water right could be undermined. *Id.* This court has noted:

"The law [...] does not require impossibilities of the appropriator; neither does it require him to do vain or useless things...."

... "[T]he full enjoyment of the water attempted to be appropriated does not, of course, commence until the works are finally completed and capable of conducting

all of the water; but[, as] against all others[ ] subsequently attempting an appropriation of the waters of the same stream, the right of the first appropriator to the use of the water dates or relates back, by what is known as the doctrine of relation."

*Van Tassel Real Estate & Live Stock Co.,* 54 P.2d at 913 (quoting 2 Kinney, A Treatise on the Law of Irrigation and Water Rights, *supra,* § 740 at 1280, § 741 at 1281). Relation back encourages the development of water resources by allowing prospective appropriators to initiate appropriation and then complete financing, engineering, and construction aspects of their projects with the understanding that, with diligent pursuit and development, their rights will become absolute upon beneficial use with a priority date of the initial action. 94 C.J.S. *Waters* § 365 (2001). However, it does not encourage or promote speculation in water rights which have no reasonable probability of maturing into completed appropriations. *Id.*

[¶ 22] In *Campbell,* we referred to the doctrine of relation back as the "right of gradual development"[5] stating, "courts ought not, we think, take it upon themselves to declare that the right of gradual development was taken away from the defendant company as a matter of law by the mere fact that the development was slow." 100 P.2d at 144. Further, work on one part of a system may constitute reasonable diligence in the completion of the entire system for the purpose of demonstrating reasonable diligence in development of the appropriation. 94 C.J.S. *Waters, supra* at § 365; *City of Lafayette v. New Anderson Ditch Company,* 962 P.2d 955, 961 (Colo.1998) (en banc). Over time, other courts have also responded by adapting the doctrine to better address complex projects. *New Anderson Ditch Company,* 962 P.2d at 961; *Dallas Creek Water Company v. Huey,* 933 P.2d 27 (Colo.1997) (en banc); *Montana Department of Natural Resources and Conservation v. Intake Water Company,* 171 Mont. 416, 558 P.2d 1110 (1976).

[¶ 23] The doctrine of relation back is significant in this case because the unsuc-

5. "[T]he discussion in [*Van Tassel*] of the doctrine of relation—the right of gradual develop-

ment—is applicable herein." *Campbell,* 100 P.2d at 142.

cessful claimants can be considered to have begun irrigation at the time the permits were filed for the federal project—that is, 1905— and, as a matter of law, the claimants should be considered to have been acting diligently at the time they acquired the reserved rights from their allottee successors.

### D. Wind River Irrigation Project—Intended to Benefit Allottees and Their Successors

 [¶ 24] The unsuccessful claimants assert the irrigation project, permitted through the state by an employee of the Bureau of Indian Affairs, was intended to facilitate beneficial use of the reserved water rights. The record strongly supports the conclusion the federal government's construction of the project and compliance with Wyoming state water law requirements were intended to allow beneficial use of the Indian reserved rights. The original applications for permits to divert, executed by Mr. Wadsworth as superintendent and special disbursing agent of the Shoshone Agency, indicate he is the applicant in his official capacity and the use to which the water will be applied is "the irrigation of Indian lands hereinafter described." In a letter to the state engineer dated October 10, 1918, W.S. Hanna, the supervising engineer of the United States Indian Irrigation Service, succinctly explained the policy reasons behind the Indian Irrigation Service's many filings in observance of Wyoming state law:

> My understanding [6] of the Indian Service attitude in this matter is briefly as follows. Various court decisions have established beyond dispute the prior rights of the Indians to sufficient water for the irrigation of their lands. The filing of requests for permits and requests for extensions of time for proof of beneficial use in compliance with the Wyoming State laws has been systematically followed out. This plan of procedure was suggested in the Act of 1905 which [c]eded a portion of the original Indian Reservation. In my opinion the object of this proce[ ]dure is two-fold-viz. Giving public notice of the

prior rights of the Indians and the protection of the water rights of purchasers of Indian lands by permitting such purchasers to submit to your office proof of beneficial use and to receive certificate designating the date of the original filing as their priority date. The latter is of extreme importance as large areas [of] the Indian irrigated lands are rapidly passing into white ownership and it is imperative that water rights and especially priorities of water rights be protected as practically the entire value of this land for agricultural purposes is dependent on the validity of the water right.

> . . . . .

> . . . [T]racts are constantly being sold to white men and in order to safe-guard the interests of these white men and allow them, after purchasing the land, to have sufficient time in which to make proof of beneficial use, we wish to secure any necessary extensions of time for proof of beneficial use in accordance with the Wyoming State laws.

This letter was written after the *Winters* case made it clear the Indians had reserved rights in the treaties which would be extremely valuable given their early priority date.

[¶ 25] From the beginning, the United States government's clear purpose was to protect and provide water to the Indian lands. The requests for extensions were also intended to permit the non-Indian purchasers to maintain the water rights they acquired from the Indian allottees by allowing beneficial use when the water was finally available through development of the project. Furthermore, the United States government dealt with the project and lands within the project as single enterprise as evidenced by the affidavit of Louis Twitchell, former project manager and an employee of the Bureau of Indian Affairs Irrigation Department for over thirty years. Of particular note, Mr. Twichell's affidavit reflects:

> 4. In 1957, the BIA was still developing and constructing project structures pursuant to the original permit applications sub-

---

6. Mr. Hanna later in the letter clarifies that his view of the matter is "substantially the view of the Indian Office in the matter of water rights on the Wind River Indian Reservation."

mitted to the State of Wyoming in 1905. A lot of laterals to serve the project lands were built after 1957.

5. Any preexisting private ditches that may have served the lands under this claim were subsumed into the project when the project encompassed those lands. If lands were classified under the project as assessable, those lands have to pay their pro rata share of the project assessments.

6. All of the BIA ditches are run as one project. Money collected for operation and maintenance charges are spent project wide.

[¶ 26] This evidence demonstrates the project was intended to irrigate all the lands within the project. Though progress was incremental, it was evident and frequently reported to state water officials. Any private ditches were subsumed by the project when it encompassed the land upon which those ditches were located. One can infer whatever individual expense and effort were made to put private ditches in place pending arrival of the project facilities would be a temporary benefit to be replaced by the project facilities. Moreover, those assessable properties within the project were financially invested in the construction through their pro rata share of project assessments.

[¶ 27] The tribes argued that the non-Indian successors did not rely upon the existence of the reserved rights when they purchased the allotments. While the legal significance of that fact is arguable, history suggests the opposite. The letter from the project proponents specifically noted the value of the Indian rights as a direct result of the court decisions recognizing such rights, and, without water, the allottees' lands would be valueless. On the other side of the transaction, the non-Indian buyer certainly had notice of the existence of those rights and the on-going irrigation project that would allow those rights to be realized. It stands to reason the value of the lands within the project area increased after 1905 with the proposed construction of the federal irrigation project. Accordingly, it must be assumed that most, if not all, sales of allotments within the project area after that time were with the expectation project waters would ultimately be available to those parcels for irrigation.

[¶ 28] A fundamental precept of the doctrine of reserved rights and the General Allotment Act of 1887 was to allow Indians owning allotted lands to sell the property in fee for full value conveying therewith the appurtenant water rights to the same extent non-Indians could sell fee lands with appurtenant water rights. Absent that, the right to sell the land would be all but worthless to the Indian allottee. *Walton I*, 460 F.Supp. at 1328; *Big Horn I*, 753 P.2d at 112–13. By the same reasoning, it is incongruent on one hand to hold the Indian allottees could sell their reserved water rights with their lands for full value but on the other hand to effectively render the reserved rights worthless because, at the time of transfer, the irrigation project which would allow beneficial use of the reserved water was incomplete. Recognizing that we find ourselves at a place in history which requires us to presume what parties would have intended almost a century ago while at the same time knowing they were not sufficiently clairvoyant to foresee the courts' development of the requirements for a *Walton* right, we conclude the irrigation project, which allowed exploitation of the Indian reserved rights, had to have had an effect on both the value paid and received for the allotments and the actions on the part of the individual non-Indian successors to develop the water rights received with their purchases. The project was constructed to benefit the reserved rights, and our application of the diligence test required for *Walton* claims must reflect that reality.

[¶ 29] Relying on the due diligence of others to qualify for a water right essentially by proxy finds support in Wyoming case law:

> A man cannot apply for water, or divert it, for idle purposes. He must claim it, if he wants to separate it from the unappropriated body of water. But the claim need not, we think, be personal in the sense that no one else can reap the benefit thereof. That was virtually held in *Rutherford v. Lucerne Canal & Power Company*, 12 Wyo. 299, 313, 75 P. 445. In that case one Pratt made the application and received the permit. The Lucerne Canal & Power

Company, which he and others organized, adopted it, proceeded under it, though it was not assigned to it, and diverted the water pursuant thereto. The court held that a third party could not take advantage of the fact that Pratt did not personally fulfill the requirements of the permit. A ditch company in Colorado which diverts water is treated as an intermediate agent for the ultimate user of the water. *Farmers' High Line Canal & Reservoir Company v. Southworth,* 13 Colo. 111, 130, 21 P. 1028, 4 L.R.A. 767; *Wyatt v. Larimer & Weld Irrigation Co.,* 18 Colo. 298, 308, 33 P. 144, 36 Am. St. Rep. 280. The water user, in such case, receives the benefit of the intent of the ditch company. After all, ... no matter who may initiate the right, if it is perfected the general purpose of an appropriation is accomplished.... *No good reason, accordingly, appears, if the law is complied with in other respects, why a man should be forbidden to act as volunteer for another in connection with the steps leading up to a perfected appropriation.*

*Scherck v. Nichols,* 55 Wyo. 4, 95 P.2d 74, 79 (1939) (some citations omitted & emphasis added). The district court's decision as a matter of law to ignore the diligence demonstrated by the project on behalf of the claimants was erroneous.

**E. Wyoming Law Allows Substantial Time for Completion of Large Irrigation Projects for "Good Cause Shown"**

[¶ 30] Pursuant to § 41–4–506, permit applicants are allowed five years to complete a project and five more years to provide beneficial use. The state engineer can, for "good cause shown," grant extensions of the original construction deadline period. Section 41–4–506. This court noted in *Associated Enterprises, Inc. v. Toltec Watershed Improvement District,* 578 P.2d 1359, 1365–66 (Wyo.1978):

[Section] 41–4–506 finds its genesis in the common-law concept of due diligence which, in the context of water law, has been expressed as follows:

[T]he law does not require any unusual or extraordinary efforts, but it does re-

quire that which is usual, ordinary, and reasonable. The diligence required in the prosecution of the construction of all works necessary for the diversion and application of water in an attempted appropriation of the same is that constancy or steadfastness of purpose or labor which is usual with men engaged in like enterprises, and who desire a speedy accomplishment of their designs.

2 Kinney on Irrigation and Water Rights, p. 1269.

[¶ 31] Over the many decades of the project's development, numerous applications for extension were filed that explained the progress made since the last request for extension and reported additional irrigated acreage. By way of example, the August 28, 1920, extension request letter sets out:

The Ray Ditch Main Canal was completed many years ago. The Enlargement of the LeClair–Riverton No. 3 was completed in 1916. In each case the lateral system is not yet complete and some portions of the lands under the systems are unable to receive water at the present time. Work has been carried on each year on every Government system on this Project but our Congressional appropriations have been so reduced that it has been impossible to complete the lateral system on any one unit.... [O]nly a small portion of the most urgent work could be accomplished.

The extension request letter of September 24, 1926, is similar if a bit more positive in developments:

Also during the period of the last extension there has been considerable extension work done on the lateral systems of the various units making it now possible to reach many tracts that were not previously able to receive water deliveries.... [T]he final completion of the construction work on the lateral systems is therefore dependent on the amounts appropriated for this purpose.

 [¶ 32] All the requested extensions were granted exhibiting the state engineer's conclusion that good cause was shown and adequate progress was being made on the project to warrant protecting the rights

created by the original permit applications. We view the fact the project took more than fifty years to finish as not truly relevant. What constitutes reasonable time depends upon the circumstances in each case and particularly upon the magnitude of the enterprise and the difficulties encountered. *Campbell*, 100 P.2d at 142. "The question of diligence must be determined in the light of all factors ... including the size and complexity of the project; ... the economic ability of the claimant; and the intervention of outside delaying factors such as wars, strikes and litigation." *Colorado River Water Conservation District v. Twin Lakes Reservoir and Canal Company*, 171 Colo. 561, 468 P.2d 853, 856 (1970) (en banc) (citations omitted). As long as a water system as a whole is being completed with due diligence, it is inconsequential that a part of it proceeds slowly. The priority applies to the whole project. *Colorado River Water Conservation District v. Twin Lakes Reservoir and Canal Company*, 181 Colo. 53, 506 P.2d 1226, 1228 (1973) (en banc).

[¶ 33] The true concern is whether it was continually developed over time without any significant gaps indicating termination or some other significant work stoppage. Lengthy development periods for complex projects are not unknown in our state. The water project in *Van Tassel* was thirty-three years in duration, and the irrigation project in *Campbell* took over forty-five years to complete. *Van Tassel Real Estate & Live Stock Co.*, 49 Wyo. 333, 54 P.2d 906; *Campbell*, 55 Wyo. 347, 100 P.2d 124. Both projects were deemed to have been diligently developed, and those efforts were attributed to the individual appropriators. We see no authority for treating the holder of a *Walton* right any differently.

## F. Differential Treatment of Successful Claimants and Unsuccessful Claimants

[¶ 34] The district court found:

8. The Tacking Claimants can not rely upon the diligence of the United States in constructing water conveyances to their property. They may, however rely upon the diligence of the United States under its state permit to provide the Tacking Claimants with a priority date of 1905....

Although the order does not explicitly provide a reason for that conclusion, presumably the court believed such reliance failed to demonstrate the claimants' "individual" diligence. However, inconsistently, the court held the unsuccessful claimants could rely on the project for their individual diligence under state law.

[¶ 35] The district court confirmed the special master's definition of reasonable diligence by finding: . .

This Court is convinced that a better policy would be to address this problem in a two step process. First, proof of irrigation within five years of acquisition raises a presumption of reasonableness. This presumption can be rebutted as there may be cases when water and a means of applying it to the land was readily available during the five years after acquisition but was not applied.

The second and more difficult step in this process arises when water is not applied to the land within five years after its sale by the allottee.... Should not reasonableness encompass other factors such as intent, distance and/or obstacles to the water source and diligence? This Court believes that it should. In the event that water is not applied to a beneficial use within five years, the second step would be to look at the due diligence of the allottee's successors in applying water to a beneficial use.

The district court further qualified the "reasonable time" description as follows:

There should be no time limit on extensions as measured in days, months or years. It is a factual issue to determine whether the allottee's successors demonstrated "that constancy or steadfastness of purpose or labor which is usual with men engaged in like enterprises, and who desire a speedy accomplishment of designs." Each claim must be determined on its own merits. If a claimant can make such a showing, the Court will infer reasonableness regardless of the time period after which the allotment was first sold.

[¶ 36] Despite the district court's careful and accurate description of how "reasonable diligence" should be determined, it rejected the unsuccessful claimants' claims, concluding instead, as a matter of law, they could not rely on the gradual development of the federal project over the ten- to twenty-year period after they acquired title to their allotments. We believe the legally appropriate approach would have been for the district court to follow its own outline for determining reasonable diligence and take the same approach evidenced by the Ninth Circuit Court of Appeals when it applied Washington state "due diligence" law to ascertain how much of Mr. Walton's acreage had been diligently irrigated and thus was entitled to a reserved right priority date. *Walton III,* 752 F.2d at 402–03. We conclude the district court incorrectly ignored state law regarding "reasonable time" and instead found there must be a showing the claimants made an individual effort to irrigate the lands during the time the federal project was under way but incomplete.

[¶ 37] The Ninth Circuit Court of Appeals found any restriction on transferability would result in a diminution in value of the Indian's reserved right which must be supported by clear Congressional intent. *Walton II,* 647 F.2d at 50. Nowhere did Congress indicate its clear intent, nor do we believe it would have so intended, that transferees of allottees needed to meet a more stringent diligence standard than required for all other water right claimants. We find no authority for concluding the reasonable diligence required for a *Walton* right and that required to maintain a state water right are different in kind or quality.

[¶ 38] We are persuaded by the state's argument that a consequence of the district court's order was the successful claimants received preferential and inconsistent treatment as compared to the treatment the unsuccessful claimants received. By way of specific example, we look to two claims, successful Claim No. 250 and unsuccessful Claim No. 243. Claim No. 250, transferred out of allotted status in 1944, was first irrigated by project waters in 1947 and was found to qualify for the reserved priority. Claim No. 243 on the other hand passed out of allotment status in 1923, the project sublateral was available to the land in 1936, and irrigation occurred in 1940. Claim No. 243 was irrigated seven years earlier than Claim No. 250, yet it was denied the *Walton* right for failure to meet the "reasonable time" requirement. Still, the unsuccessful claim was deemed to have been developed diligently enough to secure a 1905 priority. We can find no support for such disparate treatment in the federal law of reserved rights.

[¶ 39] The state correctly notes the factual distinctions between successful claimants and unsuccessful claimants fell into three categories: (1) The unsuccessful claimants generally had lands transferred out of Indian ownership significantly earlier than the successful claimants, thus increasing the time between allotment transfer and beneficial use; (2) the federal project facilities were not extended to the unsuccessful claimants' lands until later phases of the project were completed, also thereby increasing the time between allotment transfer and beneficial use; and (3) in some instances individual unsuccessful claimants may not have acted diligently to irrigate after the federal project facilities became reasonably available to serve their lands. The state proposes, in order to equalize the "reasonable time" standard between all claimants, that the unsuccessful claimants be required to demonstrate what lands were put under irrigation with due diligence *after the federal project facilities became available to the property.* We are persuaded this is the appropriate standard for the unique factual circumstances this dispute presents.

[¶ 40] We are dealing in legal fictions intended to impart justice in a reasoned and equitable manner. 2 Kinney, A Treatise on the Law of Irrigation and Water Rights, *supra,* § 743 at 1285. The "project availability" standard, for lack of a better term, considers all factors and still requires a showing of the individual diligence of the allottees' successors once water was available. It does not, however, create a different standard for claimants due to either an earlier date or a later date of transfer from allotment status or availability of project water.

[¶ 41] The tribes and the United States argue the district court's order must be affirmed because *Walton* rights must be narrowly interpreted to limit their destabilizing effect. At this juncture, we are talking about seventeen claims in addition to the approximately 200 successful claims. We can reasonably infer the "destabilizing effect" is minimal. Further, nothing in this opinion expands the nature or quality of *Walton* rights or reserved rights. Instead, we are simply applying our state law of "reasonable time" and "due diligence" to the *Walton* claimants. We would be remiss if we ignored our state law because of an unfounded fear that our holding somehow erodes federal reserved rights. It does not.

[¶ 42] The tribes and the federal government also argue the purpose of the "reasonable time" requirement for *Walton* rights is to assure the non-Indian successor intended to make use of the allottee's right to put water to use. This argument is reminiscent of language from *Hibner* we cited previously that "the application of any other rule would permit such grantee for an indefinite period to reclaim the balance of his land and withhold the application of the water to a beneficial use." 27 F.2d at 912. Simply because the non-Indian was forced to wait for this irrigation project, which was well known to the public and proceeding diligently, does not indicate a lack of intent to use the water, nor does it create an indefinite period of delay which may encourage speculation or uncertainty in water rights administration. If the non-Indian successor took individual action diligently once water was available, that is satisfactory evidence of his original intent.

[¶ 43] As noted previously, the special master acknowledged in her report that, absent the United States' assistance in constructing the Wind River Irrigation Project, irrigation would not have been possible on any of the *Walton* claimants' lands. It appears no one contests this determination. If there had been a reasonable means to irrigate any of these properties without the project, the *Walton* standard and state law would require the irrigation be accomplished through the due diligence of the individual successor to the allottee. We have no intention of altering that requirement by this decision. We hold, under the circumstances of this case and presuming irrigation was not possible absent the project, in order to establish beneficial use of the reserved water within a reasonable time to retain the federal reserved right, the unsuccessful claimants must demonstrate their efforts to put the lands under irrigation within a reasonable time and with due diligence, as defined by state law, *after the federal project facilities became available to the properties.* We remand for proceedings consistent with this determination. We anticipate such further proceedings should not require substantial additional evidentiary proceedings; however, this is difficult to tell because the record submitted did not provide the special master's report and recommendation for all claims and, for this reason, is incomplete. The district court must decide whether sufficient evidence exists in the record to determine individual claimants did or did not act with reasonable diligence after the federal project water was available to their lands.

## G. "Reasonable Time" Element Dates from Transfer by Original Indian Allottee

[¶ 44] In two of the claims subject to this appeal, the properties were transferred from allotment status into non-Indian ownership, subsequently were sold to Indian purchasers, and then were conveyed again to non-Indian purchasers. The appellants contend the determination of the "reasonable time" element should run from the most recent conveyance out of Indian ownership. The district court held the calculation of "reasonable time" begins when the allotted property first passes out of allotment status, and we agree.

[¶ 45] As noted above, this court in *Big Horn I*, 753 P.2d 76, relied, in large part, on the precedent of *Walton II*, 647 F.2d 42, to hold that non-Indian purchasers of land from Indian allottees obtain reserved water rights. In *Walton III*, 752 F.2d at 402 (emphasis added), it was made even clearer that the pivotal element was the transfer from the allottee:

A careful reading leaves no doubt that *the immediate grantee of the original allottee* must exercise due diligence to perfect his or her inchoate right to the *allottee's ratable share* of reserved waters. This interpretation is supported by our reference to *Walton II* in subsequent cases. *See, e.g., United States v. Anderson*, 736 F.2d 1358, 1362 (9th Cir. 1984) ("use it or lose it"); *United States v. Adair*, 723 F.2d 1394, 1417 (9th Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984).

 [¶ 46] In *Big Horn I*, 753 P.2d at 114 (emphasis added), we said:

We have already held that a non-Indian purchaser from an *Indian allottee* obtains a reserved water right with a treaty priority date, and that his non-Indian successor would likewise succeed to the treaty priority date. *There is no reason then to deny the same priority to an Indian or tribal purchaser.*

The clear meaning is that an Indian and/or tribal purchaser from an Indian allottee would obtain the same reserved water right with treaty priority date as a non-Indian purchaser from an Indian allottee.

[¶ 47] To hold, as the appellants suggest, that any interim purchase by an Indian would restart the computation of "reasonable time" would irrevocably undermine the integrity and finality of the water rights adjudication process. There would be no certainty of priority dates because mere repurchase by an Indian successor anywhere in the chain of title would restart the "reasonable time." Further, such a holding could, and perhaps invariably would, lead to collusive transactions by those willing to find a "straw man"[7] for the precise purpose of thwarting established priority dates. Therefore, we affirm this portion of the district court's decision and hold the calculation of "reasonable time" begins with the immediate grantee of the original allottee.

---

7. Straw man or party is described as:
A "front"; a third party who is put up in name only to take part in a transaction. Nominal party to a transaction; one who acts as an agent for another for ·the purpose of taking title to real property and executing whatever docu-

### H. Consideration and Weight Given 1943 Proof of Appropriation by the Special Master and as Adopted by the District Court

[¶ 48] The district court, affirming the special master, discounted the evidentiary value of a sworn proof of appropriation executed in 1943 offered by Brad Bath to prove beneficial use of water on the subject land before 1910 for Parcels B–2, B–3, and B–5. Mr. Bath was attempting through the document to establish irrigation within a "reasonable time" to qualify for the *Walton* right. The special master stated:

There is evidence that none of the Singing Rabbit allotment was being irrigated the year before it was first sold to a non-Indian in 1909. Herschel Griffin testified that the allotment was under irrigation about 1920. That would be 11 years after the sale. The statement in the proof that beneficial use of the water was completed before 1910 is hardly convincing because the proof was filed 33 years after that date. Therefore, there was no credible evidence that the land was put under irrigation within a reasonable time after its first sale to a non-Indian.

[¶ 49] Mr. Bath argues the proof of appropriation was uncontradicted and unimpeached by the tribes and the United States. Therefore, according to Mr. Bath, the court erred by rejecting the evidence.

[¶ 50] This issue may have been rendered moot by our holding that unsuccessful claimants, including Mr. Bath, may establish the "reasonable time" factor by demonstrating due individual diligence to utilize reserved waters once project facilities were made available to their properties. Because it cannot be determined from the extant record whether Mr. Bath did exercise such individual diligence, we will consider the matter.

 [¶ 51] It is well established that " '[t]he burden of proof is on the party

---

ments and instruments the principal may direct respecting the property. Person who purchases property for another to conceal identity of real purchaser, or to accomplish some purpose otherwise not allowed.
Black's Law Dictionary 1421 (6th ed.1990).

asserting the affirmative of any issue. *Morrison v. Reilly,* Wyo., 511 P.2d 970 (1973).' " *Big Horn I,* 753 P.2d at 90 (quoting *Osborn v. Manning,* 685 P.2d 1121, 1124 (Wyo.1984)); *see, e.g., Younglove v. Graham & Hill,* 526 P.2d 689, 693 (Wyo.1974) (holding burden of proof is on one asserting an affirmative defense); *Hawkeye–Security Insurance Co. v. Apodaca,* 524 P.2d 874, 879 (Wyo.1974). The objection involves the sufficiency of the evidence. When addressing a sufficiency-of-the-evidence question, this court looks at only the evidence most favorable to the prevailing party, giving it every favorable inference and leaving out of consideration entirely evidence in conflict therewith. *Big Horn I,* 753 P.2d at 89; *Allstar Video, Inc. v. Baeder,* 730 P.2d 796, 798 (Wyo.1986); *Wangler v. Federer,* 714 P.2d 1209, 1216–17 (Wyo.1986); *Tremblay v. Reid,* 700 P.2d 391, 392 (Wyo. 1985); *City of Rock Springs v. Police Protection Association,* 610 P.2d 975, 980 (Wyo. 1980). In this same vein, we will not disturb a specific factual finding unless the finding is clearly erroneous or against the great weight of the evidence. *Barton,* 996 P.2d at 3; *Murphy v. Stevens,* 645 P.2d 82, 85 (Wyo. 1982); *Shores v. Lindsey,* 591 P.2d 895, 899 (Wyo.1979).

 [¶ 52] We cannot conclude the special master's discounting the evidentiary value of the proof of appropriation was clearly erroneous. It is the fact-finder's role to evaluate the evidence as well as weigh the witnesses' credibility. *DeWitt v. State,* 917 P.2d 1144, 1148 (Wyo.1996). Neither of the individuals who signed the document testified at the hearing, and Herschel Griffin's live testimony indicated the date of the first beneficial use was in the time frame of 1920. The evidence of the actual irrigation was obviously very sparse, and the special master had the opportunity to observe the witness giving testimony. We cannot supplant the fact-finder's judgment absent overwhelming contrary evidence and, therefore, affirm.

### SUMMARY

[¶ 53] We acknowledge the extraordinary and thoughtful efforts of the district court and the special master in this litigation. However, we conclude requiring allottees' successors in the Wind River Irrigation Project to demonstrate irrigation within a reasonable time after the project water became available to the properties is the proper standard for *Walton* rights under the circumstances of this case. We reverse in part and remand for further proceedings consistent herewith. Further, we affirm both the district court's determination the "reasonable time" calculation begins when allotted property first passes out of allotment status and the weight given by the special master to the 1943 proof of appropriation for the Bath claim.

[¶ 54] Affirmed in part, reversed in part, and remanded.